United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ROY JONES,

             Petitioner,

    v.

ROBERT NEUSCHMID, Warden,

             Respondent.

Case No. 18-01738 EJD (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK**

Petitioner filed a <u>pro se</u> petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging his state conviction ("Petition"). Dkt. No. 11. The Court stayed this action so that Petitioner could exhaust his claims in state court. Dkt. No. 26. After Petitioner moved to reopen this action, the Court screened the Petition and concluded that the Petition stated cognizable claims which merited an answer from Respondent. Dkt. No. 29.

Respondent filed an answer on the merits ("Answer"), Dkt. Nos. 33 and 33-1, and Petitioner filed a traverse ("Traverse"), Dkt. No. 36, followed by four supplements to the traverse, Dkt. Nos. 40-43. Upon the Court's request, Respondent filed a supplemental answer ("Supplemental Answer"), Dkt. No. 44, and Petitioner filed a supplemental traverse ("Supplemental Traverse"), Dkt. No. 45. Petitioner subsequently filed motions to submit new evidence. <u>See</u> Dkt. Nos. 48, 51, 53, 54.

1  For the reasons set forth below, the Petition for a Writ of Habeas Corpus is

2  **DENIED**.

3  ## I. BACKGROUND

4  On July 29, 2015, Petitioner was found guilty by a jury in Alameda County

5  Superior Court ("trial court") of torture, kidnapping, kidnapping for ransom, false

6  imprisonment of a hostage, and multiple counts of false imprisonment, corporal injury,

7  assault with a deadly weapon, and child abuse.  The jury also found that Petitioner used a

8  deadly and dangerous weapon, inflicted great bodily injury on his victim, and inflicted

9  great bodily injury on his victim under circumstances involving domestic violence.  Ans.,

10  Ex. A ("Clerk's Transcript") at 496-98, 500-12.

11  On January 31, 2017, the California Court of Appeal ("state appellate court")

12  affirmed the judgment in a reasoned opinion.  Ans., Ex. F.  The California Supreme Court

13  summarily denied a petition for direct review on August 12, 2017.  Ans., Ex. G.  The

14  California Supreme Court summarily denied Petitioner's state-court habeas petition on

15  January 2, 2019.  Ans., Ex. H.

16  The Court received the Petition on April 11, 2018.  Pet.

17  ## II. STATEMENT OF FACTS

18  The following facts are taken from the opinion of the state appellate court:

> The charges arose out of defendant's kidnapping, imprisonment,
> and torture of Alexandria.  The couple met in 1996, and had five
> children together.  On January 14, 2015, the two were no longer
> in a relationship, and their children were visiting defendant.
> That night, defendant called Alexandria and asked if she could
> hold a light while he changed a circuit on his car.  Alexandria
> grew tired of holding the light after about two hours, and
> defendant told her they could get someone else who could help.
> They then picked up someone Alexandria referred to only as
> "crack head."  The three returned to defendant's house, and
> Alexandria waited near the front of the garage while defendant
> went to open the door from the inside.  Defendant opened the
> garage door and said "grab her."  "Crack head" placed
> Alexandria in a chokehold and dragged her through the garage
> and into the basement.
>
> As Alexandria was dragged through the garage, defendant hit
> her all over her body.  Once in the basement, Alexandria tried to

Order Denying Petition for Writ of Habeas Corpus; Denying COA
P:\PRO-SE\EJD\HC.18\01738Jones_denyHC

United States District Court
Northern District of California

run out the door, but defendant hit her in the head with a hammer. Defendant then accused Alexandria of stealing from him. He instructed her to take off all her clothes, get on her stomach, and crawl to him "like the snake that you are." As Alexandria crawled, defendant cursed at her, and accused her of taking their kids to a shelter and stealing things. Defendant hit Alexandria with a hammer on the back of her left knee. Alexandria tried to run out the door and defendant again hit her in the head with the hammer. Alexandria passed out, and the next thing she remembered was waking up in a bathtub the following morning. She apparently passed out again, and woke up naked in a bedroom.

Defendant kept Alexandria in the bedroom for several days and repeatedly asked her where his pills and money were. Alexandria said she didn't know what he was talking about. Defendant did not believe her and hit her with the hammer and a stick on her knees, shins, feet, and arms. Defendant put boiling hot compresses on Alexandria's eyes, stating he thought it would take the bruising and swelling away. Defendant also put pain medication in Alexandria's mouth, and directed her to swallow it. The pills made Alexandria fall asleep.

When defendant would ask Alexandria where she put his things, she would make something up to avoid getting hit with the hammer. Alexandria heard defendant instruct their children to take a taxi to her house in Berkeley and search it. Alexandria later heard defendant talking to their kids on the phone and telling them to bring back a bag in which she kept all of her paperwork, including the pink slip to her car. Later, defendant made Alexandria write a note stating she was going to sell the car to him.

On January 24, 2015, the 10th day of her captivity, Alexandria was able to contact the police. She communicated with one of her sons, who was also in defendant's house, while defendant was on the phone. She told the son to place his phone in the bathroom. Alexandria then went into the bathroom and used the phone to call 911. The police arrived at defendant's house just after 11:00 p.m. that night. A standoff ensued as the police unsuccessfully tried to get the residents out using a PA system. In the early morning, after about six hours, the SWAT team breached the front door. When the police entered the living room, they found defendant holding an infant in front of him. An officer opined defendant was using the child as a human shield. The police grabbed the child and arrested defendant.

<u>People v. Jones</u>, No. A146095, 2017 WL 412629, at *1–2 (Cal. Ct. App. Jan. 31, 2017)

(unpublished); <u>see also</u> Ans., Ex. F.

### III. DISCUSSION

**A.**     **Standard of Review**

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); Rose v. Hodges, 423 U.S. 19, 21 (1975). The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. Williams, 529 U.S. at 412; Brewer v. Hall, 378 F.3d 952, 955 (9th Cir. 2004). While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied. Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir.), overruled on other grounds by Lockyer v. Andrade, 538 U.S. 63 (2003).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's

case." <u>Williams</u>, 529 U.S. at 413.  "Under § 2254(d)(1)'s 'unreasonable application'

clause, . . . a federal habeas court may not issue the writ simply because that court

concludes in its independent judgment that the relevant state-court decision applied clearly

established federal law erroneously or incorrectly." <u>Id.</u> at 411.  A federal habeas court

making the "unreasonable application" inquiry should ask whether the state court's

application of clearly established federal law was "objectively unreasonable." <u>Id.</u> at 409.

The federal habeas court must presume correct any determination of a factual issue made

by a state court unless the petitioner rebuts the presumption of correctness by clear and

convincing evidence.  28 U.S.C. § 2254(e)(1).

Here, as noted above, the California Supreme Court summarily denied Petitioner's

petitions for review.  <u>See supra</u> at 2; Ans., Exs. G, H.  The state appellate court, on direct

review, addressed three of the claims raised in the instant petition.  Ans., Ex. F.  The state

appellate court thus was the highest court to have reviewed those three claims in a

reasoned decision.  As to the three claims that were presented to the state appellate court

on direct appeal, it is that decision that this Court reviews herein.  <u>See Ylst v. Nunnemaker</u>,

501 U.S. 797, 803-04 (1991); <u>Barker v. Fleming</u>, 423 F.3d 1085, 1091-92 (9th Cir. 2005).

As to the claims that Petitioner raised to the California Supreme Court in his state

habeas petition but did not raise on direct appeal, as noted above there is no reasoned

opinion on collateral review.  Accordingly, this Court "must determine what arguments or

theories supported or, as here, could have supported, the state court's decision; and then it

must ask whether it is possible fairminded jurists could disagree that those arguments or

theories are inconsistent with the holding in a prior decision of this Court." <u>Harrington v.</u>

<u>Richter</u>, 562 U.S. 86, 101 (2011).

The Supreme Court has vigorously and repeatedly affirmed that under AEDPA,

there is a heightened level of deference a federal habeas court must give to state court

decisions.  <u>See Hardy v. Cross</u>, 565 U.S. 65, 66 (2011) (per curiam); <u>Harrington</u>, 562 U.S..

at 96-100; <u>Felkner v. Jackson</u>, 562 U.S. 594 (2011) (per curiam).  As the Court explained:

United States District Court
Northern District of California

"[o]n federal habeas review, AEDPA 'imposes a highly deferential standard for evaluating state-court rulings' and 'demands that state-court decisions be given the benefit of the doubt.'" Id. at 1307 (citation omitted).  With these principles in mind regarding the standard and limited scope of review in which this Court may engage in federal habeas proceedings, the Court addresses Petitioner's claims.

**B**.     **Claims and Analysis**

Petitioner raises the following grounds for federal habeas relief,[1] which the Court found cognizable:

1. Violation of Petitioner's right to counsel because he was without counsel for some days, see Pet. at 119-25;

2. Petitioner's sentence violates due process and constitutes multiple punishment, see id. at 126-27;

3. Petitioner's conviction for kidnapping in count three must be reversed as a necessarily included offense of kidnapping for ransom in count two, see id. at 128;

4. Prosecutorial misconduct, in that the prosecutor (a) failed to correct false testimony by the victim; (b) misstated the DNA expert's testimony; (c) failed to correct false testimony by a police officer; (d) presented false testimony by the victim's children; (e) delayed disclosing video footage from the bodycam of an arresting officer, (f) withheld medical records that would have helped Petitioner's case, and (g) withheld a police report from a prior dispute between Petitioner and the victim, see id. at 10-62;

5. Ineffective assistance of trial counsel, in that trial counsel (a) did not move to dismiss on the grounds of delay; (b) failed to introduce exculpatory evidence; (c) did not properly impeach the victim; (d) did not properly impeach the victim's child; (e) did not object to misleading statements by the prosecutor; and (f) did not

---

[1] The Court has reorganized this summary of the grounds for relief to match the order in which the Court will discuss Petitioner's claims.

Order Denying Petition for Writ of Habeas Corpus; Denying COA
P:\PRO-SE\EJD\HC.18\01738Jones_denyHC

1    withdraw or seek a continuance, see id. at 90-109;

6. Ineffective assistance of appellate counsel, in that appellate counsel failed to argue that (a) there was insufficient evidence to support the charge for torture; (b) there was insufficient evidence to support the charge for kidnapping for ransom; (c) there was insufficient evidence to support the enhancements for personal use of a deadly weapon and great bodily injury; (d) the charge for false imprisonment by violence was legally unsound; (e) the charges for child abuse were legally unsound; and (f) the charge for false imprisonment using a hostage was legally unsound, see id. at 63-69;

7. Structural error, in that (a) defense counsel had a conflict of interest; (b) Petitioner lacked counsel for some days after the withdrawal of his public defender; (c) the trial court denied Petitioner's request for funds necessary to obtain expert witnesses; (d) the trial court ordered defense counsel to cease investigations on Petitioner's behalf; (e) the trial court refused to hear Petitioner's motion for dismissal on the basis of a speedy trial violation; (f) after the jury began deliberating, the trial court allowed the prosecutor to reopen the case; and (g) after the case was reopened, the trial court refused to allow Petitioner to respond to new evidence, see id. at 110-18;

8. Inadmissible evidence, in that (a) a video, (b) a 911 call, (c) a pink slip and note of ownership, and (d) voicemails were all admitted into evidence without foundation and without a chain of custody having been established, see id. at 74-78;

9. Defective jury instructions, in that the trial court did not correctly instruct the jurors on how to manage their notes, see id. at 6; and

10. New evidence has been discovered which undercuts the victim's testimony, see id. at 80-89.

The Court will first address those claims for which the state appellate court issued a reasoned opinion. After addressing those claims, the Court will analyze the claims for which no reasoned opinion is available

7

1

### 1.    **Claim That Petitioner Was Deprived of Access to Counsel**

Petitioner claims that he was denied access to counsel.  See Pet. at 119-25.

Specifically, Petitioner contends that he was without counsel after the public defender

withdrew from representation on February 25, 2015 and after Petitioner invoked his right

to counsel on March 11, 2015, and that this deprivation of counsel lasted until May 8,

2015.  See id. at 121-22.  This period of time fell after the information was filed, see id. at

119, but before Petitioner was arraigned and entered a plea, see id. at 123.[2]  Petitioner

claims that being left without counsel during this time violated Petitioner's Sixth

Amendment right to counsel.  See id.

The state appellate court considered and rejected Petitioner's claim as follows:

> Defendant first argues his right to counsel was violated.  We
> disagree.  While there was a delay in finding counsel for
> defendant, that delay was solely due to defendant's failure to
> make a serious effort to select a lawyer.  The trial court exercised
> great patience and made reasonable efforts to assist defendant in
> obtaining counsel.
>
> The procedural history supports our conclusion.  The
> information in this matter was filed on February 24, 2015.  The
> following day, defendant's public defender withdrew from the
> case, concluding defendant was financially ineligible for the
> public defender's services.  The trial court continued the matter
> to allow defendant to find counsel.
>
> Defendant failed to find a new attorney by the next hearing,
> which was held on March 4, 2015, and the court entered an order
> allowing defendant to use the jail phone to find one.  Defendant
> indicated he wanted to contact Darryl Stallworth about
> representing him.   The court indicated it would provide
> defendant with Stallworth's number and continued the matter to
> March 6, 2015.   At the March 6 hearing, defendant stated
> Stallworth was "conferring with my family for the monies."
> Defendant also said he wanted to contact more attorneys, and
> the court agreed to provide their contact information and issue a
> "phone order" so defendant could reach them.
>
> Defendant again appeared before the court on March 11, 2015.
> He stated he had not been able to retain Stallworth because "he
> needed cash up front."   The matter was continued.  On March

---

[2] Petitioner states that he was not arraigned.  The record reflects that, once Petitioner was
appointed counsel, his counsel waived formal arraignment.  See Ans., Ex. B1 at 24:12-13.

17, 2015, defendant again appeared without counsel. He stated he had made some phone calls, but did not intend to continue to do so. The court continued the matter to March 19, 2015, and urged defendant to retain an attorney. At the March 19 hearing, the court asked defendant how his attorney search was going, and defendant responded: "It's not going to happen. They want a retainer up front." The court informed defendant he could use assets other than cash for the retainer, and instructed him to see if he could reach an arrangement with an attorney.

On March 23, 2015, Todd Bequette made a special appearance as defense counsel. He had not yet been formally retained. Bequette returned on April 14, 2015, indicating he had met with defendant and would not be able to make a special appearance at that time. It is unclear from the record why.

The next reported hearing was April 27, 2015, at which time the court stated: "I think the record is clear, that not only is [defendant] not retaining private counsel, it will appear that he's unwilling to do so." The court found defendant was indigent and appointed the public defender's office to represent him over the public defender's objection. The public defender declared a conflict, and the court directed staff to contact "court-appointed" based on that conflict. Defendant was told he would be ordered to reimburse the county for all or part of the cost of his representation. At an April 29, 2015 hearing, the court stated it had intended to appoint Patrick Hetrick to represent defendant, but there was a scheduling conflict because Hetrick would not have time to prepare unless defendant agreed to waive time.

The following day Darryl Billups appeared. He said he was not ready to accept an appointment, explaining defendant insisted on not waiving time, and Billups needed more time to prepare. The court asked, "What if I give you that time?" Then, over defendant's objection, the court continued the matter to May 8, 2015, for "attorney and plea." Defendant stated: "This is going on for 63 days," to which the court responded: "If you start loosening up some of the coins, this wouldn't be going on. It takes two to tango, Mr. Jones." At the May 8 hearing, Billups formally agreed to represent defendant, and the court set the trial date for June 22, 2015.

The Sixth Amendment guarantees a criminal defendant the right to assistance of legal counsel. (*United States v. Gonzalez-Lopez* (2006) 548 U.S. 140, 144.) A criminal defendant who does not require appointed counsel also has a Sixth Amendment right to the counsel of his or her choice. (*Ibid.*; accord *People v. Ortiz* (1990) 51 Cal. 3d 975, 982 [criminal defendant's right to counsel of his or her choice is among "the most sacred and sensitive of our constitutional rights"].) The United States Supreme Court has long recognized "a defendant should be afforded a fair opportunity to secure counsel of his own choice." (*Powell v. Alabama* (1932) 287 U.S. 45, 53.) "[C]ounsel must be appointed within a reasonable time after attachment to allow for adequate representation at any critical stage before trial, as

United States District Court
Northern District of California

well as at trial itself." (*Rothgery v. Gillespie County* (2008) 554 U.S. 191, 212.) "In addition, counsel, 'once retained, [must be] given a reasonable time in which to prepare the defense.' [Citation.] Failure to respect these rights constitutes a denial of due process." (*People v. Courts* (1985) 37 Cal. 3d 784, 790.)

Here, defendant complains he was without any representation for 73 days, from the date of his first appearance in superior court to when Billups was appointed counsel on May 8, 2015. During this period, defendant contends, he had no counsel to argue he should be released on bail, to review police reports or other items of discovery, or to ascertain whether all discovery had been provided by the prosecution. Defendant further argues the delay in the appointment of counsel impacted his constitutional and statutory right to a speedy trial, since the statutory period for the commencement of trial did not commence running until the appointment of counsel. Defendant acknowledges he had difficulty retaining an attorney before May 8. But he argues, the trial court should have appointed an attorney on an interim basis during this period to assist him in whatever needed to be done in his case.

But defendant alone was responsible for the delay in the appointment of counsel. As recounted above, the trial court gave defendant every opportunity to employ counsel of his choice. Among other things, the court obtained the numbers of various attorneys and ordered defendant be permitted to make phone calls to contact them. In spite of the trial court's efforts, defendant failed to make a sincere attempt to retain counsel. Defendant balked at paying a retainer or making other arrangements to pay counsel, despite the public defender's finding he was not indigent. And at one point early on in the process, defendant indicated he did not intend to contact any more attorneys about representing him. As the trial court found, defendant was the one who dragged out the process. Eventually, the court was forced to find defendant indigent and appoint an attorney for him. This record does not support a finding that defendant's Sixth Amendment right to counsel was violated. We also observe critical proceedings were not held while defendant was without counsel. The only prejudice that flowed from defendant's failure to find counsel was delay, and that delay was of defendant's own making. Reversal is not warranted under these circumstances.

Jones, 2017 WL 412629, at *2–4 .

Counsel must be present at all "critical stages" of the prosecution, absent an intelligent waiver by the defendant. United States v. Wade, 388 U.S. 218, 226, 237 (1967); United States v. Hamilton, 391 F.3d 1066, 1070-71 (9th Cir. 2004). The stages of a prosecution deemed "critical" for Sixth Amendment purposes include arraignments,

1    post-indictment identification lineups, hearing on pre-trial motion to suppress evidence,

2    sentencing, court-ordered psychiatric examinations to determine competency to stand trial

3    and future dangerousness, the decision whether to plead guilty, and the process of plea

4    bargaining and period of potential cooperation with the government.  See id. at 1070

5    (citing cases).  In addition, the right to counsel does not attach until that right is invoked.

6    See United States v. Harrison, 213 F.3d 1206, 1209 (9th Cir. 2000) ("A defendant also

7    must invoke the Sixth Amendment right by hiring a lawyer or asking for appointed

8    counsel.").

9        Here, Petitioner does not identify any "critical stage" during which he was deprived

10   of counsel.  See Pet. at 123.  Instead, Petitioner argues that having to wait for counsel for

11   fifty-eight days after he invoked his right to counsel and before counsel was appointed was

12   not "reasonable."  See Pet.  at 122-23.

13       There are two problems with Petitioner's argument.  First, Petitioner's Sixth

14   Amendment right to counsel had not yet attached during the time in question.  The Ninth

15   Circuit has repeatedly recognized that, as to California criminal proceedings, the right to

16   counsel does not attach until a criminal defendant is arraigned.  See Hendricks v. Vasquez,

17   974 F.2d 1099, 1104 (9th Cir. 1992) ("The sixth amendment right to counsel attaches after

18   a defendant has been arraigned."); see also People v. Bradford, 14 Cal. 4th 1005, 1045

19   (1997) ("Defendant was repeatedly told that a public defender would be appointed for him

20   when he was arraigned . . . .  That is in fact when his right to counsel attached.")); Brown

21   v. Rowland, 215 F.3d 1332 n.2 (9th Cir. 2000) ("Because Brown had not been arraigned

22   when he was interviewed by Detective Bender, his Sixth Amendment right to counsel had

23   not yet attached.") (unpublished) (relying on Bradford, 14 Cal. 4th at 1045).  Here,

24   Petitioner concedes that counsel was appointed before Petitioner was arraigned.  See Pet.

25   at 123.  Although there was a slight delay in the appointment of counsel, because counsel

26   was appointed before Petitioner's right to counsel attached, there is no Sixth Amendment

27   violation.

28

United States District Court
Northern District of California

Order Denying Petition for Writ of Habeas Corpus; Denying COA
P:\PRO-SE\EJD\HC.18\01738Jones_denyHC

1    Second, even if Petitioner's right to counsel had attached pre-arraignment – which it

2    did not – the United States Supreme Court has refused to implement "a per se rule

3    requiring reversal of every conviction following tardy appointment of counsel." Chambers

4    v. Maroney, 399 U.S. 42, 54 (1970).  In that case, the criminal defendant did not meet with

5    his counsel "until a few minutes before" trial began. Id. at 53.  However, because the

6    United States Supreme Court concluded the petitioner had not been prejudiced by this

7    belated appointment, he was not entitled to habeas relief. See id. at 53-54; see also United

8    States v. Cronic, 466 U.S. 648, 661 (1984) (re-affirming that there is no per se rule that the

9    Sixth Amendment was violated when appointment of counsel is delayed).  Accordingly,

10    even if Petitioner's right to counsel had attached pre-arraignment – which it did not – the

11    Court would be required to examine whether Petitioner was prejudiced by the delayed

12    appointment. See Gomez-Velazco v. Sessions, 879 F.3d 989, 993–94 (9th Cir. 2018)

13    ("[T]he Supreme Court has held that denial of counsel at the preliminary hearing stage is

14    subject to harmless error review rather than an automatic reversal rule.")

15    Here, it is apparent that any delay between Petitioner's invocation of his right to

16    counsel and the appointment of that counsel was harmless.  First, the record shows that no

17    proceedings occurred during that time; instead, the trial court granted multiple

18    continuances so that Petitioner would have the benefit of counsel during important

19    proceedings. See generally, Ans., Ex. B1.  Second, counsel was appointed with sufficient

20    time to prepare for trial, as Petitioner was appointed counsel more than two months before

21    trial began. See Pet. at 121 (showing counsel was appointed on May 8, 2015); see also

22    Ans., Ex. B at 1 (showing that jury selection began on July 9, 2015), 18 (showing the jury

23    trial began on July 21, 2015).  The United States Supreme Court has found far shorter

24    preparation periods to be sufficient. See Avery v. State of Alabama, 308 U.S. 444 (1940)

25    (habeas relief not warranted although counsel was appointed three days before trial);

26    Chambers, 399 U.S. at 53-54 (no relief where counsel was appointed minutes before trial).

27    Third, defense counsel was able to file pre-trial motions, see Ans., Ex. B at 12 (discussing

28

Order Denying Petition for Writ of Habeas Corpus; Denying COA
P:\PRO-SE\EJD\HC.18\01738Jones_denyHC

United States District Court
Northern District of California

United States District Court
Northern District of California

defense motion for a bifurcated trial), and to investigate witnesses' backgrounds for the purposes of impeachment, see id. at 9 (discussing the victim's background). There is thus no indication that the slight delay in appointment of counsel prevented counsel from preparing for trial in a way that implicates Petitioner's Sixth Amendment rights.

Moreover, it is apparent that Petitioner suffered no prejudice from the slight delay in appointing counsel, because the evidence against Petitioner was overwhelming. The victim testified at length as to Petitioner's kidnapping of and beating her. See Ans., Ex. B at 190-328. The victim's testimony was corroborated by her children's testimony,[3] see id. at 331-62; testimony by multiple police officers, see id. at 52-74, 75-79, 80-95, 98-141, 157-188; physical evidence, see id. at 370-88, 504-09; and medical records, see id. at 143-56. Petitioner provides no evidence or argument to suggest that if counsel had been appointed earlier then counsel would have been able to overcome this overwhelming evidence, and so does not demonstrate that the outcome of his trial would have been different had counsel been appointed earlier.

Finally, as the state appellate court noted, the delay in the appointment of counsel was Petitioner's own fault. The public defender concluded that Petitioner was not financially eligible for representation by that office, and "vigorously oppose[d]" appointment. Ans., Ex. B1 at 1:13-15, 19-20. The trial court attempted to assist Petitioner in obtaining counsel, by granting Petitioner numerous continuances, giving Petitioner special permission to use the jail phone, and providing Petitioner with phone numbers for attorneys who might have been willing to represent him. Jones, 2017 WL 412629, at *2-3 (cataloguing the trial court's efforts). It is Petitioner who flatly refused to call potential counsel, though he had the money to pay counsel. See Ans., Ex. B1 at 11:1-11. It is Petitioner who refused to pay the retainer necessary to hire private counsel, though he had the assets to pay such a retainer. See id. at 2:22-26 (noting that Petitioner was not even

---

[3] Although one child has recanted his testimony ("Child 1"), see Dkt. Nos. 51, 54, a second child ("Child 2")also testified regarding Petitioner's attack on the victim, see Ans., Ex. B at 354:15-362:28. The Court will discuss the recanted testimony, infra.

1  "close" to being financially eligible for representation by the public defender), 11:12-14

2  ("[I]t's the Court's opinion that you are certainly able to retain private counsel if, shall we

3  say, so inclined."), 13:26-14:1 (noting Petitioner's assets.  In exasperation, the trial court

4  was finally forced to declare Petitioner indigent (despite the evidence to the contrary) so

5  that it could appoint counsel to represent him.  See id. at 18:7-28.

6  The state appellate court did not unreasonably apply Rothgery v. Gillespie County

7  when it decided that Petitioner cannot force a delay in the appointment of counsel, and

8  then claim that he should be granted habeas relief on the basis of that delay.  See generally,

9  Jones, 2017 WL 412629, at *2–4 .  Accordingly, Petitioner is not entitled to relief on this

10  claim.

11  Petitioner's claim based on the alleged deprivation of counsel is DENIED.

12  **2.    Claim That Petitioner's Consecutive Sentences Are Unlawful**

13  Petitioner was convicted of both torture and kidnapping for ransom, and the trial

14  court ordered the sentences to run consecutively.  See Ans., Ex. B at 532:3-12.  Petitioner

15  claims that these sentences should merge under California Penal Code § 654, because his

16  conduct "was indivisible and for the same intent and purpose."  Pet. at 127.

17  The California appellate court rejected Petitioner's claim as follows:

18  Next, defendant asserts the trial court erred by sentencing him
   to consecutive terms for count one, torture, and count two,
19  kidnapping for ransom.  Defendant contends the consecutive
   sentence was imposed in violation of section 654.  We find no
20  error.

21  Section 654, subdivision (a) provides: "An act or omission that
   is punishable in different ways by different provisions of law
22  shall be punished under the provision that provides for the
   longest potential term of imprisonment, but in no case shall the
23  act or omission be punished under more than one provision.  An
   acquittal or conviction and sentence under any one bars a
24  prosecution for the same act or omission under any other."

25  The statute "prohibits punishment for two offenses arising from
   the same act or from a series of acts constituting an indivisible
26  course of conduct.  [Citations.]  'Whether a course of criminal
   conduct is divisible and therefore gives rise to more than one act
27  within the meaning of section 654 depends on the intent and
   objective of the actor.  If all of the offenses were incident to one

28

14

United States District Court
Northern District of California

United States District Court
Northern District of California

objective, the defendant may be punished for any one of such offenses but not for more than one.' [Citations.] On the other hand, if the defendant entertained multiple criminal objectives that were independent and not incidental to each other, he or she 'may be punished for each statutory violation committed in pursuit of each objective' even though the violations were otherwise part of an indivisible course of conduct. [Citation.] '"The principal inquiry in each case is whether the defendant's criminal intent and objective were single or multiple." [Citation.] "A defendant's criminal objective is 'determined from all the circumstances....'" ' " (*People v. Sok* (2010) 181 Cal. App. 4th 88, 99.) A trial court's determination under section 654 must be affirmed if it is supported by substantial evidence. (*People v. Osband* (1996) 13 Cal. 4th 622, 730.)

Defendant argues the evidence is uncontradicted he had only one objective in committing torture and kidnapping for ransom: he was attempting to recover money and other items from Alexandria. Defendant asserts that, on at least two occasions, he sent their two eldest sons to Alexandria's house to look for certain items. According to defendant, the evidence also shows he made Alexandria sign a paper to sell her car to him.

While it may be reasonable to find defendant had only one objective in committing counts one and two, that is not the only reasonable inference that may be drawn from the evidence. The trial court could have also reasonably concluded defendant had distinct and separate objectives in committing torture and kidnapping for ransom. As defendant argues, there is evidence supporting a finding he committed kidnapping for ransom to retrieve certain items. But there is also substantial evidence defendant engaged in torture for a different purpose. For example, the object of the crime could have been to demean or punish Alexandria because defendant believed she had stolen from him. The record supports such a conclusion. Defendant beat Alexandria with a hammer, forced her to take off her clothes and crawl to him like a snake, and placed boiling hot compresses on her eyes. Given defendant's erratic behavior, it was not unreasonable to conclude he engaged in these actions to inflict pain, rather than to induce Alexandria to turn over certain items or assets.

*Jones*, 2017 WL 412629, at *4.

Respondent answers that, because Petitioner challenges only the state appellate court's interpretation of state law, this claim is not cognizable on federal habeas. Ans. at 30. The Court agrees. Petitioner's arguments rest on state law and the misapplication thereof. See Pet. at 126-27. Indeed, the lengthy discussion by the state appellate court rejecting this claim involves only state penal codes and the relevant state case law. See

Jones, 2017 WL 412629, at *4.  The Supreme Court has repeatedly held that the federal habeas writ is unavailable for violations of state law or for alleged error in the interpretation or application of state law.  See Swarthout v. Cooke, 562 U.S. 216, 219 (2011); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Engle v. Isaac, 456 U.S. 107, 119 (1982); Peltier v. Wright, 15 F.3d 860, 861-62 (9th Cir. 1994); see, e.g., Little v. Crawford, 449 F.3d 1075, 1082 (9th Cir. 2006) (claim that state supreme court misapplied state law or departed from its earlier decisions does not provide a ground for habeas relief).  It is unavailable merely because "something in the state proceedings was contrary to general notions of fairness or violated some federal procedural right unless the Constitution or other federal law specifically protects against the alleged unfairness or guarantees the procedural right in state court."  Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985), cert. denied, 478 U.S. 1021 (1986).

Moreover, the Ninth Circuit has directly addressed the issue of consecutive sentences, and held that "[t]he decision whether to impose sentences concurrently or consecutively is a matter of state criminal procedure and is not within the purview of federal habeas corpus." Cacoperdo v. Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994); accord. Souch v. Shaivo, 289 F.3d 616, 623 (9th Cir. 2002) ("because the trial court actually had *absolute discretion* to impose either consecutive or concurrent sentences[,] ... neither an alleged abuse of discretion by the trial court in choosing consecutive sentences, nor the trial court's alleged failure to list reasons for imposing consecutive sentences, can form the basis for federal habeas relief.") (emphasis in original); Oregon v. Ice, 555 U.S. 160 (2009) (no Apprendi error if a judge decides to impose consecutive sentences).

Because Petitioner's claim is not cognizable in a federal habeas proceeding, Petitioner is not entitled to relief on this claim.[4]

---

[4] Even if this claim were cognizable in a federal habeas petition – which it is not – the Court would not hold that the state appellate court's determination was unreasonable. California defines torture as "inflict[ing] great bodily injury "with the intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose . . . ."  Cal. Penal Code § 206.  As the state appellate court noted, there

1    Petitioner's claim based on the alleged sentencing error is DENIED.

2    **3.      Claim That Kidnapping is a Necessarily Included Offense of**

3    **Kidnapping for Ransom**

4    Petitioner was convicted of kidnapping for ransom in Count 2 and of kidnapping in

5    Count 3.  See Pet. at 128.  The trial court stayed the sentence on Count 3.  See Ans., Ex. B

6    at 532:13-15; see also id. at 530:6-13 (prosecutor did not object to a "merge" of Counts 2

7    and 3).  Petitioner claims that his conviction for "simple kidnapping" must be reversed

8    because it is a necessarily included offense of kidnapping for ransom.  See id.

9    The state appellate court rejected Petitioner's claim as follows:

10   Defendant was convicted of both kidnapping in violation of
     section 207 and kidnapping for ransom in violation of section
11   209.  He now argues his conviction for simple kidnapping
     cannot stand because it is a necessarily included offense of
12   kidnapping for ransom.  The argument is unavailing.

13   "In California, a single act or course of conduct can lead to
     convictions 'of any number of the offenses charged.'
14   [Citations.]  However, a judicially created exception to this rule
     prohibits multiple convictions based on necessarily included
15   offenses." (*People v. Ramirez* (2009) 45 Cal. 4th 980, 984.)  "To
     ascertain whether one crime is necessarily included in another,
16   courts may look either to the accusatory pleading or the statutory
     elements of the crimes....  'The elements test is satisfied if the
17   statutory elements of the greater offense include all of the
     statutory elements of the lesser offense, such that all legal
18   elements of the lesser offense are also elements of the greater.
     [Citation.]  In other words, " '[i]f a crime cannot be committed
19   without also necessarily committing a lesser offense, the latter
     is a lesser included offense within the former.' " ' " (*People v.*
20   *Robinson* (2016) 63 Cal. 4th 200, 207.)  "Simple kidnapping is
     not a lesser and necessarily included offense to a violation of
21   section 209, subdivision (a) [ (kidnapping for ransom) ] since
     the latter can be accomplished without asportation and the
22   former cannot." (*People v. Greenberger* (1997) 58 Cal. App.
     4th 298, 368, fn. 56; *People v. Bigelow* (1984) 37 Cal. 3d 731,
23   755, fn. 14.)

24

25   _____

26   was evidence from which the  trial court and jury could conclude that Petitioner intended
     to extort items from the victim, and evidence from which the trial court and jury could
27   conclude that Petitioner intended to demean, punish, or inflict pain upon the victim.  See
     Jones, 2017 WL 412629, at *4 (discussing evidence that Petitioner forced the victim to
28   crawl like a snake across the floor).

17

United States District Court
Northern District of California

1

2

3

4

5

6

> Defendant appears to concede this point on reply, arguing that even if kidnapping is not a necessarily included offense of kidnapping for ransom, there was clearly only one kidnapping. Defendant reasons that since he had only one intent or objective for this one kidnapping, he should not stand convicted of two kidnappings. But as discussed, in California, a single course of conduct "can lead to convictions 'of any number of the offenses charged.' " (*People v. Ramirez*, *supra*, 45 Cal. 4th at p. 984.) To the extent defendant is asserting the trial court committed
>
> sentencing error under section 654, his argument also fails as his sentence for the kidnapping count was stayed.

7   <u>Jones</u>, 2017 WL 412629, at *5.

8           Respondent first asserts that Petitioner failed to exhaust this claim, because it was

9   not raised in his petition to the California Supreme Court on direct review, or in his state

10  habeas petition. <u>See</u> Ans. at 33. Although Petitioner cursorily states that he exhausted this

11  claim, <u>see</u> Traverse at 4, it does not appear to have been raised to the California Supreme

12  Court, <u>see</u> Ans., Exs. G-H. Accordingly, Petitioner has not exhausted this claim. <u>See</u>

13  <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 845 (1999) (explaining that, to exhaust, a petitioner

14  must invoke "one complete round of the State's established appellate review process.");

15  <u>see also</u> 28 U.S.C. § 2254(b)(3) ("A State shall not be deemed to have waived the

16  exhaustion requirement . . . unless the State, through counsel, expressly waives the

17  requirement."). While this Court may deny an unexhausted claim on the merits, <u>see</u>

18  <u>Cassett v. Stewart</u>, 406 F.3d 614, 624 (9th Cir. 2005) (holding a court may deny an

19  unexhausted petition that fails to raise a federal claim), it may not grant an unexhausted

20  claim, <u>see</u> 28 U.S.C. § 2254(b)(1) (a habeas petition "shall not be granted unless it appears

21  that . . . the applicant has exhausted the remedies").

22          Next, Respondent asserts that because Petitioner challenges only the state appellate

23  court's interpretation of state law, this claim is not cognizable on federal habeas. Ans. at

24  33. Petitioner's arguments rest on state law and the misapplication thereof, <u>see</u> Pet. at 128,

25  and the state appellate court discussed only state penal codes and the relevant state case

26  law in denying this claim. <u>See</u> <u>Jones</u>, 2017 WL 412629, at *5.

27

28

United States District Court
Northern District of California

18

As explained <u>supra</u> B.2, this Court cannot grant the federal habeas writ for violations of state law or for alleged error in the interpretation or application of state law. <u>See Swarthout</u>, 562 U.S. at 219; <u>Estelle</u>, 502 U.S. at 67-68; <u>Engle</u>, 456 U.S. at 119; <u>Peltier</u>, 15 F.3d at 861-62; <u>see, e.g., Little</u>, 449 F.3d at 1082.  Because Petitioner raises only a state-law claim, this Court cannot consider it. [5]

Furthermore, federal courts generally are bound by a state court's construction of state laws, <u>see, e.g., Melugin v. Hames</u>, 38 F.3d 1478, 1487 (9th Cir. 1994) (federal court bound by Alaska Court of Appeals' interpretation and decision that state statute was properly applied to the petitioner's conduct), except when it appears that its interpretation is an obvious subterfuge to evade the consideration of a federal issue, <u>see Peltier</u>, 15 F.3d at 862.  The Court finds no indication of subterfuge in the state appellate court's lengthy and thorough analysis of these claims under the relevant state statutes.  Accordingly, this Court is bound by the state appellate court's interpretation and decision that Petitioner's kidnapping conviction was not a necessarily included lesser offense of his kidnapping for ransom conviction, and could be found to be an independent act.  <u>See Melugin</u>, 38 F.3d at

---

[5] Even if the Court were permitted to review this claim on the merits as brought under the Double Jeopardy Clause, the Court notes that it would almost certainly fail for at least two reasons.

First, Petitioner was not subjected to multiple punishments for the same offense because his sentence for Count 3 was stayed pursuant to California Penal Code § 654.  <u>See</u> Answer, Ex. B at 532:13-15; <u>see also Jones</u>, 2017 WL 412629, at *5 ("To the extent defendant is asserting the trial court committed sentencing error under section 654, his argument also fails as his sentence for the kidnapping count was stayed.").  The Ninth Circuit has recognized that, where "[t]he trial court stayed sentence on the other counts," the petitioner "is not twice <u>punished</u> for the same act." <u>Deshotels v. State of Cal.</u>, 43 F.3d 1478 (9th Cir. 1994) (unpublished) (citing <u>Ohio v. Johnson</u>, 467 U.S. 493, 498 (1984)); <u>accord Lytle v. Alameida</u>, No. 03-cv-4414-SI-PR, 2007 WL 3344275, at *7-8 (N.D. Cal. 2007) (holding that stayed sentence could not constitute multiple punishment under the Double Jeopardy Clause).

Second, even if Petitioner had been sentenced for each offense, under the test developed in <u>Blockburger v. United States</u>, 284 U.S. 299, 304 (1932), his sentence would not have violated the Double Jeopardy Clause: under California law kidnapping and kidnapping for ransom constitute separate offenses, as explained in the opinion of the state appellate court.  <u>See Jones</u>, 2017 WL 412629, at *5; <u>see also People v. Bigelow</u>, 37 Cal. 3d 731, 755 n. 14 (1984) ("Simple kidnaping (§ 207) has been held a lesser included offense in kidnaping to commit robbery . . .  but not in kidnaping for ransom, reward, or extortion, since asportation is not essential to that crime . . . .") (citations omitted).

19

1487.  Petitioner offers no argument in his Traverse to persuade this Court otherwise.

Accordingly, this claim must be denied as non-cognizable.

For these reasons, Petitioner's claim based on the allegedly included offense is

DENIED.

### 4.        Claims for Prosecutorial Misconduct

Petitioner contends that the prosecutor committed misconduct, in that the prosecutor

(a) failed to correct false testimony by victim; (b) misstated the DNA expert's testimony;

(c) failed to correct false testimony by a police officer; (d) presented false testimony by the

victim's children; (e) delayed disclosing video footage from the bodycam of an arresting

officer, (f) withheld medical records that would have helped Petitioner's case, and (g)

withheld a police report from a prior dispute between Petitioner and the victim.  See Pet. at

10-62.  The Court will discuss Claims 4(a) through 4(d) together, as they involve allegedly

false testimony.  The Court will then discuss Claims 4(e) through 4(g) together, as they

involve withholding of evidence.

Because these claims were presented for the first time in a state habeas petition in

the state high court and were summarily denied, the Court must conduct an independent

review of the record to determine whether the state court's decision was an objectively

unreasonable application of clearly established federal law.  Plascencia v. Alameida, 467

F.3d 1190, 1198 (9th Cir. 2006).

A defendant's due process rights are violated when a prosecutor's misconduct

renders a trial "fundamentally unfair."  Darden v. Wainwright, 477 U.S. 168, 181 (1986).

Under Darden, the first issue is whether the prosecutor's remarks were improper; if so, the

next question is whether such conduct infected the trial with unfairness.  Tan v. Runnels,

413 F.3d 1101, 1112 (9th Cir. 2005); see also Deck v. Jenkins, 768 F.3d 1015, 1023 (9th

Cir. 2014) (recognizing that Darden is the clearly established federal law regarding a

prosecutor's improper comments for AEDPA review purposes).  A prosecutorial

misconduct claim is decided "'on the merits, examining the entire proceedings to

determine whether the prosecutor's remarks so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Johnson v. Sublett, 63 F.3d 926, 929 (9th Cir. 1995); see Trillo v. Biter, 769 F.3d 995, 1001 (9th Cir. 2014) ("Our aim is not to punish society for the misdeeds of the prosecutor; rather, our goal is to ensure that the petitioner received a fair trial."). Even if there was misconduct, a habeas petitioner is not entitled to relief unless the misconduct "'had a substantial and injurious effect or influence in determining the jury's verdict.'" Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). In other words, state prisoners seeking federal habeas relief may obtain plenary review of constitutional claims of trial error, but are not entitled to habeas relief unless the error resulted in "actual prejudice." Id. (citation omitted); see e.g., Johnson, 63 F.3d at 930 (finding prosecutorial vouching "could not have had substantial impact on the verdict necessary to establish reversible constitutional error" under Brecht).

### a. Petitioner's false-testimony claims

Petitioner claims that the prosecutor failed to correct false testimony from the victim and a police officer, mischaracterized a DNA expert's testimony, and presented false testimony by the victim's children. To succeed on this claim, Petitioner must satisfy three elements

> "First, the testimony or evidence in question must have been false or misleading. . . . Second, the State must have known or should have known that it was false or misleading. . . . And third, . . . the testimony or evidence in question must be material. . . . Materiality under *Napue* requires . . . [that there] be a 'reasonable likelihood that the false testimony could have affected the judgment of the jury.'"

Panah v. Chappell, 935 F.3d 657, 664 (9th Cir. 2019) (citations omitted; summarizing Napue v. People of State of Ill., 360 U.S. 264, 269-71 (1959)). Petitioner's claim will fail if he "still 'received a fair trial, understood as a trial resulting in a verdict worthy of confidence.'" Id. (citation omitted).

United States District Court
Northern District of California

1

### i. **Victim's testimony**

2      Petitioner contends that the victim testified inconsistently regarding how frequently

3  the Petitioner beat the victim, Pet. at 25-26; whether the victim ate during the period of

4  captivity, id. at 30; when Petitioner accused the victim of having taken pills, id. at 29-30;

5  when the victim's children brought the pink slip for her car, id. at 30-31; and whether she

6  "dropped the children off at Petitioner's home" in the early evening and returned later, or

7  in fact she "did not leave," id. at 20-21.

8      Respondent argues that the victim's testimony was not false.  After conducting an

9  independent review of the record, the Court agrees with Respondent.  There are some

10 minor inconsistencies in the victim's testimony on whether she made one or two trips to

11 Petitioner's house on the evening she was kidnapped, but it is well-established that mere

12 inconsistencies do not establish a prosecutor's knowing use of false or perjured testimony.

13 United States v. Sherlock, 962 F.2d 1349, 1364 (9th Cir. 1989); Sanders v. Cullen, 873

14 F.3d 778, 796 (9th Cir. 2017); United States v. Zuno-Arce, 339 F.3d 886, 889 (9th Cir.

15 2003).  Moreover, this inconsistency was immaterial.

16     Petitioner contends that the victim falsely stated she was beaten for "ten days

17 straight."  Pet. at 31.  The Court has searched the entire transcript, and found no such

18 statement.  See generally, Ans., Ex. B.  The victim's statement that Petitioner's attacks

19 "went through the entire time," id. at 233:21,  does not equate to a statement that the

20 attacks were unceasing.  Rather, the victim's description encompasses her earlier

21 testimony that Petitioner hit her several times with a pole or with a hammer on multiple

22 days of her captivity, including the first and the last day, rather than only on one occasion.

23 See Ans., Ex. A at 96:25-97:6, 97:15-27, 98:18-25.  This statement was thus not false.

24     Likewise, although Petitioner claims the victim falsely "testified she did not eat

25 during the ten day" period in which Petitioner held her captive, Pet. at 30, the victim made

26 no such assertion.  Instead, in response to an inquiry as to how the victim "would go about

27 eating," the victim said that she "[did] not remember eating."  Ans., Ex. B at 236:7-10; see

28

Order Denying Petition for Writ of Habeas Corpus; Denying COA
P:\PRO-SE\EJD\HC.18\01738Jones_denyHC

United States District Court
Northern District of California

1   also id. at 324:16-18 (responding to a question by stating she did not remember eating).  A

2   statement that the victim did not remember performing an action does not equate to a

3   statement that she did not perform the action at all.  This statement was not false.

4           Petitioner claims that, in a pre-trial preliminary hearing, the victim testified that

5   Petitioner did not accuse her of having taken pills until the second day of her captivity, but

6   at trial she testified that Petitioner accused her of having taken pills immediately upon

7   kidnapping her.  See Pet. at 29.  As Respondent correctly notes, Petitioner mischaracterizes

8   the victim's testimony from the preliminary hearing.  See Supp. Ans. at 6.  At that hearing,

9   the victim was asked about the events of the night Petitioner kidnapped her.  See Ans., Ex.

10  A at 40:10.  The victim described being grabbed by Petitioner's accomplice, dragged

11  through Petitioner's garage and into his basement, dropped in the basement, and trying to

12  escape from the basement.  See id. at 47:11-58-4.  When the victim tried to escape,

13  Petitioner hit her in the head with a hammer.  Id. at 58:5-59:21.  Petitioner did not say

14  anything to the victim up to that point.  Id. at 59:8-10.  Petitioner then ordered the victim to

15  take off her clothes and crawl to him across the floor of the basement and into the garage.

16  Id. at 59:24-62:17.  When the victim reached the garage, she again attempted to escape,

17  Petitioner hit her in the head with the hammer a second time, and the victim passed out.

18  Id. at 62:18-21.  This is not inconsistent with the victim's testimony that Petitioner accused

19  her of stealing pills while "in the basement."  Ans., Ex. B at 288:7-8; see also id. at 220:8-

20  12 (stating that during the initial attack Petitioner accused her of "stealing things," but

21  noting that she "can't remember everything he was saying").  Although the victim did not

22  mention Petitioner's accusation during the preliminary hearing, the questions in that

23  hearing focused on what the Petitioner "[did] . . to [the victim] physically," and not on

24  what he said.  Ans., Ex. A at 62:28.  The victim was never asked, nor did she purport, to

25  repeat everything Petitioner said to her while she was crawling across the floor.  See id. at

26  40:10-63:28.  Accordingly, the victim did not testify falsely when she later provided a

27  detail that she was not asked about during the preliminary hearing.

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Petitioner argues that the victim falsely stated her children brought the pink slip to her car on the last day of the victim's captivity.  See Pet. at 30-31.  Again, a review of the record reveals that the victim did not so testify.  As Respondent notes, at trial the victim began to say that her child brought the pink slip on the last day, but corrected herself and clarified that the child brought her "personal things."  Ans., Ex. B at 243:22-26.  The victim then immediately clarified that she had seen the pink slip in Petitioner's house "during the course of the ten days" in which she was held captive.  See id. at 244:7-14.  The victim's answers to two subsequent questions also made clear that the pink slip was brought to Petitioner before the last day of the victim's captivity.  See 245:1-8 (stating she saw the pink slip on one of the ten days when Petitioner was hitting her); 247:8-21 (prosecutor asking whether the victim's signature appears on the pink slip, and then "fast forward[ing] [] to the last day" of captivity).  A minor slip of the tongue, immediately corrected and then clarified at least twice more, is not false testimony.

Finally, Petitioner argues that the victim testified falsely regarding when she dropped her children off at his house, and inconsistently regarding whether she made two trips to his house on the night that Petitioner kidnapped her, or only one.  See Pet. at 26, 28.  In a preliminary hearing, the victim testified that she dropped her children off at Petitioner's house at 9:00 p.m., then received a call from Petitioner at approximately 10:00 p.m. asking for help with his car, after which the victim returned to Petitioner's house.  See Ans., Ex. A at 160:7-162:13.  At trial, the victim testified that she dropped her children off with Petitioner at "6:00, 6:30-ish," Ans., Ex. B at 195:21-24, that Petitioner called her for help with his car sometime after 9:30 p.m., see id. at 193:25-28, and that when she arrived at his house to help him, her children were already "[i]n [Petitioner's] house upstairs," id. at 195:10-11.  Along with one of Petitioner's motions for the admission of new evidence, Petitioner presents a declaration stating that the children arrived at Petitioner's house at 5:00 p.m.  See Dkt. No. 51-1.  In a police interview, the victim stated that Petitioner called her around 10:00 p.m. and asked for help with his car.  See Pet., Ex. J at 98-109.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

With respect to the number of trips the victim made to Petitioner's house, the Court has reviewed the record and concludes that the victim did not testify falsely, or even inconsistently.  The record reveals that in the police interview, the victim was not asked about whether she had dropped her children off at Petitioner's house earlier that evening.  See id.  The victim consistently testified that Petitioner called her for assistance with his car near 10:00 p.m., and that it was after 10:00 p.m. when she arrived at his house to assist him.  See Pet., Ex. J at 98; Ans., Ex. A at 162:11-12; Ans., Ex. B at 193:24-27.  Because the police did not ask whether the victim made only one trip to Petitioner's house, or whether there were two trips, the victim's testimony that there were two trips was not inconsistent with her statement to the police.

Although the Court concludes that the victim testified inconsistently regarding when she dropped her children off at Petitioner's house, compare Ans., Ex. A at 160:7 with Ans., Ex. B at 195:21-24, these discrepancies are minor when compared with the damning evidence of Petitioner's sustained attack on the victim.  There is no "reasonable likelihood" that discrepancies in the time the children were dropped off "could have affected the judgment of the jury."  Panah, 935 F.3d at 664.

For these reasons, Petitioner failed to establish that the prosecution knowingly presented false, material testimony.

Moreover, even if Petitioner had established that the victim testified falsely on these points, he failed to establish prejudice.  As noted, supra B.1, the victim testified at length regarding Petitioner's kidnapping and beating of her, and her testimony was corroborated by testimony from two of her children (at least one of whom has not recanted this testimony), physical evidence, police testimony, and medical records.  Considering this overwhelming evidence, there is no "reasonable likelihood" that minor inconsistencies on immaterial points affected the jury's judgment.

Accordingly, Petitioner's claim that the prosecutor committed misconduct by failing to correct false testimony from the victim fails.

1

### ii.  **Police officer's testimony**

2        Petitioner contends that a police officer falsely stated the victim's "eye was three

3  inches swollen when [the officer] arrived at the hospital," whereas a medical report states

4  "1 cm subconjunctival." Pet. at 19.

5        Petitioner misunderstands the medical report.  "Subconjunctival" refers to an injury

6  occurring <u>within</u> the eye, not <u>around</u> the eye.  <u>See</u> Subconjunctival, <u>Merriam-Webster.com</u>

7  <u>Medical Dictionary</u>, Merriam-Webster, <u>https://www.merriam-webster.com/medical/</u>

8  <u>subconjunctival</u> (last visited Sept. 28, 2020) (defining "subconjunctival as "situated or

9  occurring beneath the conjunctiva"); Conjunctiva, <u>id</u>. (last visited Sept. 21, 2020) (defining

10  "conjunctiva" as "the mucous membrane that lines the inner surface of the eyelids and is

11  continued over the forepart of the eyeball").[6]  The officer clearly referred to injuries "under

12  [the victim's] eye" on the surface of her skin.  Ans., Ex. B at 87:26.  At no point did the

13  officer claim to be able to see injuries within the victim's eye.  <u>See generally, id</u>.  The

14  officer's testimony that three inches of skin under the victim's eye was swollen is thus not

15  rendered false by a medical report stating that there was one centimeter of swelling within

16  the victim's eye.

17        Accordingly, Petitioner has not shown that the officer's testimony that the victim

18  exhibited three inches of external facial swelling was made false by a medical report

19  showing one centimeter of internal swelling.

20

### iii. **DNA expert's testimony**

21        Petitioner next claims that the prosecutor mischaracterized the testimony of the

22  DNA expert by saying that the victim's DNA was on the tip of a hammer.  <u>See</u> Pet. at 33-

23  34; <u>see also</u> Ans., Ex. B at 460:15-16.  Petitioner argues that the DNA expert actually

24  "testified [the victim's] DNA was not on the hammer."  Pet. at 33.

25

26

27  _____

28  [6] "The Court may take judicial notice of medical dictionary definitions." <u>Cox v. Allin</u>
    <u>Corp. Plan</u>, 70 F. Supp. 3d 1040, 1044 n.2 (N.D. Cal. 2014) (citation omitted).

United States District Court
Northern District of California

1   A review of the record reveals that Petitioner mischaracterizes the DNA expert's

2   testimony.  As Respondent notes, the DNA expert actually testified that the alleles

3   recovered from the hammer were "all consistent with [the victim's] DNA profile," and

4   none were "foreign to" the victim.  Ans., Ex. B at 382:14-16; see also Ans. at 5.  The DNA

5   expert explained that, although she was able to obtain only a partial DNA profile, "those

6   alleles that we detected from the head of the hammer occur[] approximately once in 19

7   million individuals."  Ans., Ex. B at 383:7-9.

8   It is well-settled that "prosecutors are free to argue reasonable inferences from the

9   evidence."  United States v. Gray, 876 F.2d 1411, 1417 (9th Cir. 1989).  Considering how

10   rarely the recovered alleles occur within the population, [7] it is reasonable to infer from the

11   DNA evidence that the genetic material recovered from the hammer belonged to the

12   victim.  Thus, the prosecutor did not mischaracterize the DNA expert's testimony when he

13   summarized that testimony as stating that the victim's DNA was on the hammer.

14   Moreover, Petitioner failed to establish prejudice.  The victim testified at length

15   regarding Petitioner's kidnapping and beating of her, and her testimony was corroborated

16   by testimony from her children (at least one of whom has not recanted), physical evidence,

17   police testimony, and medical records.  There is no "reasonable likelihood" that the

18   prosecutor's summing-up of the DNA expert's testimony affected the jury's judgment.

19   **iv. Child 1's testimony**

20   Petitioner claims that the prosecutor knowingly presented false testimony from the

21   victim's eldest child ("Child 1").  See Pet. at 17-18, 20-21.  Petitioner asks the Court to

22   consider a declaration from Child 1, in which Child 1 recants portions of his testimony.

23   See Dkt. No. 51 & 51-1.[8]

24

25   [7] For context, as another court in this District has noted, the entire population of Northern
California "is approximately 12,000,000."  Day v. Colvin, No. 14-CV-04919-KAW, 2015

26   WL 5961647, at *2 (N.D. Cal. Oct. 13, 2015) (citing U.S. CENSUS, 2010 Census
Interactive Population Search, http://www.census.gov/2010census/popmap/ipmtext.

27   php?fl=06).
[8] Respondent argues that Petitioner uses this declaration to support an entirely new, and

28   unexhausted, claim.  See Dkt. No. 52.  The Court disagrees.  In his motion requesting the

United States District Court
Northern District of California

1    First, Petitioner contends that Child 1 falsely testified that Petitioner was already at

2    home when the victim and the children arrived.  See Pet. at 17 (citing Ans., Ex. B at 334:6-

3    8).  Petitioner contends that Petitioner's security footage will demonstrate that Petitioner

4    arrived at the same time as the children.  See id.  Child 1's declaration states that the

5    victim, her children, and Petitioner "all arrived together at 5 p.m."  Dkt. No. 51-1.

6    However, the Court notes that Child 1 testified before the jury that his "dad [was] there"

7    "when [Child 1] got to the house," Ans., Ex. B at 334:6-8, which encompasses both a

8    statement that the Petitioner was at home before the children arrived, and a statement that

9    the Petitioner arrived at the same time as the children.  Accordingly, this statement by

10    Child 1 may have been vague, but was not false.

11    Second, Petitioner argues that Child 1 testified falsely when Child 1 said he saw his

12    father standing over the victim in the basement, yelling at her, while she wore no clothes,

13    see Pet. at 21 (citing Ans., Ex. B at 339:3-26), and that he saw his father carrying the

14    victim up the stairs from the basement while the victim was unconscious, see id. (citing

15    Ans., Ex. B at 339:16-340:3).  Petitioner appears to argue that these statements were

16    contrary to what Child 1 told the police.  See id. (citing Pet., Ex. K).  However, Child 1

17    told the police that,

18          I had went downstairs to see pretty much, really, what was
          happening, and I seen my dad hit my mom and I seen her, like,
19          naked on the floor, pretty much.  And, like, it woke up everyone
          in the house after she was screaming, and my mom - my dad got
20          a hammer and he hit her in the head with it a few times.  And,
          um, my mom was unconscious and she, my dad brought her up
21          to the bathtub, put some cold water in it, and, like, the blood - it
          was, like, the whole bathroom was all bloody and stuff.
22
     Pet., Ex. K at 460-66; see also id. at 772-948, 1037-86 (same).  Child 1's testimony at trial
23
     is thus not inconsistent with his statement to police.
24
          Apparently in support of his claim that the prosecution knowingly submitted false
25
     testimony by Child 1, Petitioner submits a declaration from Child 1 in which Child 1
26

27    _____

28    admission of this declaration, Petitioner clearly argues that it demonstrates the prosecutor
     put on false testimony.  This claim was raised in the Petition.

United States District Court
Northern District of California

1    recants part of that testimony.  See Dkt. Nos. 51 & 51-1.  This new evidence does not

2    change the Court's conclusion, because the circumstances make this recantation suspicious

3    and, in any event, there was such abundant evidence put to the jury aside from Child 1's

4    testimony that Petitioner cannot demonstrate prejudice.

### a.   **The Court does not credit Child 1's recantation.**

6        The Court does not credit Child 1's recantation.

7        In general, recantations are looked upon with skepticism.  The case of Jones v.

8    Taylor, 763 F.3d 1242 (9th Cir. 2014), is instructive on evaluating recanting witnesses.

9    There, the petitioner had been convicted of sexual assault of his 9-year-old sister based on

10   testimony from the victim, their father, and the victim's sister.  Several years after the

11   conviction, petitioner sought habeas relief based on the fact that the three witnesses

12   recanted their testimony.  The Ninth Circuit reversed the district court's grant of habeas

13   relief, and explained why it was skeptical of the recantations.  Id. at 1246-48.

> [Jones' evidence] is all in the form of recantation testimony,
> uncorroborated by any other evidence. As a general matter,
> "[r]ecantation testimony is properly viewed with great
> suspicion." *Dobbert v. Wainwright*, 468 U.S. 1231, 1233, 105
> S. Ct. 34, 82 L.Ed.2d 925 (1984) (Brennan, J., dissenting from
> denial of certiorari); *see also Allen v. Woodford*, 395 F.3d 979,
> 994 (9th Cir. 2005). "Recanting testimony is easy to find but
> difficult to confirm or refute: witnesses forget, witnesses
> disappear, witnesses with personal motives change their stories
> many times, before and after trial." *Carriger*, 132 F.3d at 483
> (Kozinski, J., dissenting). "It upsets society's interest in the
> finality of convictions, is very often unreliable and given for
> suspect motives...." *Dobbert*, 468 U.S. at 1233–34, 105 S. Ct.
> 34. For these reasons, a witness' "later recantation of his trial
> testimony does not render his earlier testimony false." *Allen*,
> 395 F.3d at 994; *see also Christian v. Frank*, 595 F.3d 1076,
> 1084 n. 11 (9th Cir.2010). Rather, a witness' recantation is
> considered in addition to his trial testimony and in the context
> in which he recanted when assessing the likely impact it would
> have on jurors. *See Christian*, 595 F.3d at 1084 n. 11
> (considering the timing of the witness' recantation and the
> contents of his earlier testimony in assessing the weight of the
> recantation); *Graves v. Cockrell*, 351 F.3d 143, 153 (5th
> Cir.2003) (noting that a recanting witness had given numerous
> contradictory statements in assessing the weight to give to his
> new testimony).

*Jones*, 763 F.3d at 1248.

29

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

United States District Court
Northern District of California

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

The Ninth Circuit noted that, where recantations are from family members, this "reduces their weight and reliability." Id. at 1249 (citing House, 547 U.S. at 552 (noting that testimony by friends or relations of the accused might have less probative value than testimony from disinterested witnesses); McCray v. Vasbinder, 499 F.3d 568, 573 (6th Cir. 2007) (noting that family members might have a personal stake in a defendant's exoneration).) The court also noted that the witness's recantation did not occur until 13 years after the events, and a reasonable juror could conclude that the witness's memory faded or changed, and therefore could credit the testimony closer in time to the sexual assault. Jones, 763 F.3d at 1250. Accordingly, "[t]he most that can be said of the new testimony is that it undercuts the evidence presented at trial." Id. at 1251. For these reasons, the Ninth Circuit disapproved the district court's decision to credit the witness's recantation. See id. at 1248-51.

Here, as in Jones, Child 1 bears a familial relationship with Petitioner, which makes his recantation suspect. Moreover, as an explanation for this recantation, Child 1 says only that at the time of trial he "thought [he] would get in trouble if [he] told the truth." Dkt. No. 51-1. This does not explain why Child 1 waited nearly six years to come forward with his recantation. Although Petitioner argues that he could not present this declaration until Child 1 reached eighteen years of age, see Dkt. No. 51 at 2, the record shows that Child 1 signed this declaration when he was nearly twenty years old, compare Ans., Ex. B at 330:27-331:3 (Child 1 was born April 7, 2001) with Dkt. No. 51-1 (declaration signed January 27, 2021). That Child 1 waited nearly two years into his majority to submit this declaration in his father's favor undercuts the representation that Child 1 lied at trial to avoid getting into trouble with his mother.

Moreover, "[n]o reasonable juror could find the current story credible when it is only [Child 1's] trial testimony that makes sense in light of all the other evidence." Allen v. Woodford, 395 F.3d 979, 995 (9th Cir. 2005). Although Child 1 now declares that he did not hear his mother screaming in the basement, contradicting his trial testimony, see

30

1  Dkt. No. 51-1, Child 2 independently testified at trial that he heard his mother screaming in

2  the basement, see Ans., Ex. B at 357:2-22.  Similarly, although Child 1 now declares that

3  he saw his mother throughout the ten days she was held captive, see Dkt. No. 51-1, Child 2

4  independently testified at trial that he did not see his mother for "[a]t least a week" after

5  the night she was attacked, see Ans., Ex. B at 357:25-27.

6        Under these circumstances, the Court does not credit Child 1's recantation.

7                    **b.  Petitioner cannot demonstrate prejudice.**

8        Even if the Court were to credit Child 1's recantation, Petitioner would not be

9  entitled to relief on this claim because he cannot demonstrate prejudice.  The victim

10  testified at length regarding Petitioner's kidnapping and beating of her, and her testimony

11  was corroborated by Child 2's testimony, physical evidence, police testimony, and medical

12  records.

13        Moreover, Child 1 did not recant the entirety of his testimony, only a few

14  immaterial points.  For example, although Child 1 now declares he did not hear screaming

15  coming from the basement, he did not recant his testimony that he heard screaming coming

16  from outside the house at the time his mother was attacked in the driveway.  See Ans., Ex.

17  B at 335:21-336:8.  Although Child 1 now declares that his mother walked up the

18  basement stairs under her own power, he did not recant his testimony that he saw his father

19  standing over his mother in the basement, yelling at her.  See id. at 338:27-340:2.

20  Although Child 1 now declares that he saw his mother more frequently during her captivity

21  than he told the jury, Child 1 did not recant his testimony that his mother looked "[p]retty

22  scared and shaky" and had a bruise on the side of her face that he was able to see.  See id.

23  at 350:8-15.  Nor did Child 1 recant his testimony that he hid his telephone in the bathroom

24  for her, "so my mom could, like, be free."  See id. at 350:24-351:3.  Thus, even if the

25  Court were to disregard the testimony that Child 1 now recants, the un-recanted testimony

26  would still show that Petitioner attacked the victim, held her captive, and beat her during

27  her captivity.

28

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

There simply is no "reasonable likelihood" that minor inconsistencies in Child 1's testimony, even if the Court were to disregard the testimony that Child 1 now recants, affected the jury's judgment in light of the victim's testimony, Child 1's un-recanted testimony, Child 2's corroborating testimony, police testimony, and medical records.

### b. Petitioner's withheld-evidence claims

Petitioner contends that the prosecutor delayed producing video footage from the bodycam of an arresting officer, withheld medical records that would have helped Petitioner's case, and withheld a police report from a prior dispute between Petitioner and the victim.  Petitioner's claim comes under Brady v. Maryland, 373 U.S. 83 (1963).

In Brady, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  Id. at 87.  The Supreme Court has since made clear that the duty to disclose such evidence applies even when there has been no request by the accused, United States v. Agurs, 427 U.S. 97, 107 (1976), and that the duty encompasses impeachment evidence as well as exculpatory evidence, United States v. Bagley, 473 U.S. 667, 676 (1985). Evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  Cone v. Bell, 556 U.S. 449, 469–70 (2009).  "A reasonable probability does not mean that the defendant 'would more likely than not have received a different verdict with the evidence,' only that the likelihood of a different result is great enough to 'undermine confidence in the outcome of the trial.'"  Smith v. Cain, 565 U.S. 73, 75 (2012) (quoting Kyles v. Whitley, 514 U.S. 419, 434 (1995)).

As to Petitioner's claim that the prosecution delayed producing video footage, the delay does not appear to be intentional or due to any malfeasance on the part of the prosecutor.  Instead, the record shows that the prosecutor provided the video to the defense the same day it was made available to the prosecution.  See Ans., Ex. B at 171:5-9.  The

32

1    trial court gave defense counsel the night to review the video, and until the next day to

2    lodge any objections.  See id. at 171:11-13.  Thus, "disclosure [was still] of value to the

3    accused," and the prosecutor did not violate Brady.  United States v. Gordon, 844 F.2d

4    1397, 1403 (9th Cir. 1988).  The trial court also noted for the record that the time

5    constraints were due to Petitioner's insistence on having a speedy trial.  See id. at 170:26-

6    171:5.  As the prosecution provided the video footage as soon as it was available, the video

7    footage cannot be said to have been "suppressed," as required by Brady.  Moreover, as

8    Respondent notes, Petitioner has failed to show that the video footage was favorable to

9    Petitioner in any way.  See Supp. Ans. at 3.  Accordingly, Petitioner's claim based on the

10   video footage fails.

11        As to the victim's medical records, Petitioner argues that the prosecution withheld a

12   photograph which would have established that the victim inflicted her own wounds.  See

13   Pet. at 51.  Petitioner bases his argument on the fact that the victim was bruised between

14   her elbow and wrist, which is a "tell[-]tale sign[]" of self-inflicted wounds."  Id.  However,

15   as Respondent notes, and Petitioner concedes, "the photo was admitted at the preliminary

16   hearing, so that defense counsel would have had access to it before trial."  Supp. Ans. at 9;

17   see also Pet. at 51 ("This picture was admitted into evidence in prelim.").  Thus, even if

18   Petitioner had any evidence to support his theory that the victim's bruise was self-inflicted

19   – which he does not – this evidence was not suppressed.

20        The only so-called evidence Petitioner proffers to support his assertion that the

21   victim inflicted her own wounds is an answer from a Dr. Santhosh to a question posted on

22   quora.com.  See Pet., Ex. G.  In that answer, Dr. Santhosh opines that self-inflicted wounds

23   are typically shallow, and appear on easily accessible parts of the body such as the forearm

24   of the non-dominant hand and on the leg.  See id.  Nothing about this answer on a public

25   forum suggests that Dr. Santhosh treated the victim or even reviewed her file; Dr.

26   Santhosh's answer thus would not be admissible at trial.  Even if Dr. Santhosh's statement

27   were reliable under these circumstances – which it is not – Petitioner has neither

28

Order Denying Petition for Writ of Habeas Corpus; Denying COA
P:\PRO-SE\EJD\HC.18\01738Jones_denyHC

United States District Court
Northern District of California

introduced any evidence to suggest that the victim's wounds were shallow, nor explained away the injuries the victim sustained to places other than her legs and left forearm.  See Ans., Ex. B at 350:14 (victim had bruising to her left eye), 423:27 (knot on forehead), 424:12-13 (mark on the back of her head, still bleeding), 425:10 (right side of the face), 426:12 (buttocks), 426:22 (behind the ear).[9]

As to the police report of a prior dispute between the Petitioner and the victim, Respondent correctly notes that Petitioner's counsel questioned the victim about that dispute.  See Supp. Ans. at 7; see also Ans., Ex. A at 146:2-26.  Respondent also notes that Petitioner provides no evidence to support his claim that this police report was withheld. See Supp. Ans. at 7-8.  In fact, defense counsel also discussed this incident at trial, emphasizing that the victim had not been truthful during this prior dispute.  See Ans., Ex. B at 278:23-279:13.  That defense counsel was aware of the incident and able to make use of it to impeach the victim suggests that the police report was not withheld.

Because Petitioner's claims are factually without merit, in that there was no withholding of favorable evidence, the Court finds that there was no Brady violation, 373 U.S. at 87; "confidence in the outcome of the trial" has not been undermined.  See Cain, 565 U.S. at 75.

For the reasons above, Petitioner's claims based on alleged prosecutorial misconduct are DENIED.

### 5.   Claims for Ineffective Assistance of Trial Counsel

Petitioner contends that he received ineffective assistance of trial counsel, in that trial counsel (a) did not move to dismiss on the grounds of delay; (b) failed to introduce exculpatory evidence; (c) did not properly impeach the victim; (d) did not properly impeach the victim's child; (e) did not object to misleading statements by the prosecutor;

---

[9] For the same reason, the Court denies Petitioner's request for an evidentiary hearing to determine whether the victim's arm and leg wounds were self-inflicted.  See Dkt. No. 48. The Court sees no purpose to determining whether a few of the victim's wounds to the leg and arm may have been self-inflicted, when the victim had numerous and more serious wounds to other parts of her body that could not have been self-inflicted.  See supra.

and (f) did not withdraw or seek a continuance.  See Pet. at 90-109.

Because these claims were presented for the first time in a state habeas petition in the state high court and were summarily denied, the Court must conduct an independent review of the record to determine whether the state court's decision was an objectively unreasonable application of clearly established federal law.  Plascencia, 467 F.3d at 1198.  The Court will address each alleged failure in turn.

In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, Petitioner must establish two things.  First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms.  Strickland v. Washington, 466 U.S. 668, 687-88 (1984).  Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as the result of the alleged deficiencies.  Id. at 697.

A "doubly" deferential judicial review is appropriate in analyzing ineffective assistance of counsel claims under § 2254.  See Cullen v. Pinholster, 563 U.S. 170, 202 (2011); Harrington, 562 U.S. at 105 (same); Premo v. Moore, 562 U.S. 115, 122 (2011) (same).  The general rule of Strickland, i.e., to review a defense counsel's effectiveness with great deference, gives the state courts greater leeway in reasonably applying that rule, which in turn "translates to a narrower range of decisions that are objectively unreasonable under AEDPA."  Cheney v. Washington, 614 F.3d 987, 995 (9th Cir. 2010) (citing Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).  When § 2254(d) applies, "the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard."  Harrington, 562 U.S. at 105.

1

### a. **Claim that counsel should have moved to dismiss**

2

Petitioner claims that trial counsel was ineffective for failing to file a "motion for

3

dismissal under Penal Code 1382." Pet. at 92. The Court notes that California Penal Code

4

§ 1382 provides for dismissal of an action "when a [felony] defendant is not brought to

5

trial within 60 days of the defendant's arraignment on an indictment or information." Cal.

6

Penal Code § 1382(a)(2). Petitioner thus appears to contend that his trial counsel was

7

ineffective in moving to dismiss on grounds of delay.

8

First, it does not appear that counsel was ineffective in choosing not to move to

9

dismiss on speedy trial grounds. The record shows that Petitioner filed a pro se motion to

10

dismiss the charges on speedy trial grounds, the trial court "read this motion," "f[ou]nd

11

there's no basis for it," and "den[ied] it." Ans., Ex. B at 3:14-15. Trial counsel could

12

reasonably have decided not to file a motion on the same grounds, because any such

13

motion appeared likely to fail.

14

Second, Petitioner cannot show that he was prejudiced by counsel's actions,

15

because California law provides an exception to Penal Code section 1382: "Under

16

[California Penal Code] section 1387, subdivision (a), when a felony proceeding is

17

dismissed pursuant to section 1382, the prosecution ordinarily may refile the felony charge

18

so long as it has not previously been dismissed." People v. Engram, 50 Cal. 4th 1131, 1144

19

n.5 (2010). In other words, even if Petitioner's trial counsel had moved to dismiss the

20

criminal proceeding, and been successful in that motion, the prosecution could simply have

21

refiled the felony charges against Petitioner. See id. The Ninth Circuit has previously held

22

that, where a felony charge could simply be re-filed after a dismissal on speedy-trial

23

grounds, the petitioner cannot show prejudice from counsel's failure to seek such a

24

dismissal. See Burrus v. Gonzalez, 97 F. App'x 803, 804 (9th Cir. 2004) (discussing

25

Arizona law, which allows the trial court to choose whether to dismiss with or without

26

prejudice when speedy trial rights are violated); see also Percival v. Marshall, No. 93-cv-

27

20068-RPA, 1996 WL 107279, at *3 (N.D. Cal. Mar. 7, 1996) ("Petitioner suffered no

28

United States District Court
Northern District of California

1    prejudice from such a failure [to move to dismiss on speedy trial grounds].  Petitioner

2    alleges no reason why, if the action had been dismissed, the prosecution could not simply

3    have refiled.  No change in trial outcome would have occurred.  Without prejudice, the

4    claim fails."), aff'd, 106 F.3d 408 (9th Cir. 1997).

5            Because it does not appear that counsel was ineffective in choosing not to move to

6    dismiss, and because Petitioner cannot show prejudice, the claim for ineffective assistance

7    of counsel fails.

8                      **b.  Allegedly exculpatory evidence**

9            Petitioner next claims that counsel failed to introduce exculpatory evidence.

10   Specifically, Petitioner challenges counsel's failure to present evidence that the victim's

11   wounds were self-inflicted, Pet. at 93-94, 106; the victim's statement that Petitioner had hit

12   her with a pole on a prior occasion, id. at 7; and a video in which the victim allegedly told

13   her children to lie to the police, id. at 94-95.

14           As to evidence of self-inflicted wounds, as explained, supra B.4.b, Petitioner has no

15   evidence that his victim's wounds were self-inflicted.  Petitioner's bald assertion that the

16   victim injured herself is unsupported speculation.  See supra, B.4.b.  Where, as here,

17   "testimony would not have been probative or would have been based on speculation, trial

18   counsel's failure to [introduce that testimony] was neither deficient nor prejudicial."

19   Rodriguez v. Terhune, 314 F. App'x 70, 72 (9th Cir. 2009); see also Sully v. Ayers, No.

20   92-cv-0829-WHA, 2008 WL 2128171, at *28 (N.D. Cal. May 20, 2008) ("Counsel was

21   not ineffective for failing to inject unsupported speculation into the trial."), aff'd, 725 F.3d

22   1057 (9th Cir. 2013).

23           As to Petitioner's contention that trial counsel should have introduced the victim's

24   statement that Petitioner beat her with a pole on a prior occasion, Pet. at 7, it is unclear

25   why Petitioner would want this statement presented to the jury.  In her police interview,

26   the victim stated that "[Petitioner]'s beaten me up with [the pole] . . . years ago."  Pet., Ex.

27   J at 1233, 1237.  Petitioner appears to have interpreted this as a statement that he did not

28

United States District Court
Northern District of California

37

1    hit the victim with a pole during her captivity.  See Traverse at 47.  Petitioner's

2    interpretation is incorrect.  Rather, the victim told police that Petitioner had possessed this

3    stick for years and used it to beat other people on prior occasions, see Pet., Ex. J at 1227-

4    38, used it to beat her on a prior occasion, see id. at 1233, 1237, and used it to beat her

5    during her captivity, see id. at 221, 232, 1006, 1262-63.  Counsel was not ineffective in

6    deciding not to present this evidence to the jury.  Indeed, evidence that Petitioner had

7    beaten the victim with the same pole on a prior occasion would tend to support the victim's

8    statement that Petitioner had done so on this occasion.  Where "evidence would have made

9    a difference, but in the wrong direction," courts find that counsel was reasonable in

10   electing to exclude that evidence.  Wong v. Belmontes, 558 U.S. 15, 22 (2009).

11        Petitioner contends that video evidence showed the victim coaching her children to

12   lie to the police, and argues that counsel should have used this video evidence to impeach

13   the victim.  See Pet. at 95.  Petitioner cites the Clerk's Transcript as support for his

14   assertions.  See id. at 95 (citing Ans., Ex. A at 212-27).  The Court has reviewed the

15   portions of the record that Petitioner cites, and it does not support his contentions.  For

16   example, Petitioner argues that video would show the victim "promising two children

17   rewards of the Petitioners' gaming systems if they just stick to the story."  Id.  By contrast,

18   in the transcript the victim stated that she asked her children if they had retrieved the

19   gaming system that belonged to the victim and which Petitioner had stolen, see Ans., Ex.

20   A at 219:18-23, and the transcript does not depict any encouragement of the children to

21   "stick to the story," nor does that phrase even appear, see generally id.  Similarly,

22   Petitioner represents that the victim told her child "to lie to the police as to who they live

23   with," and that the victim "work[ed] on the timeline with" the child."  Pet. at 95.  By

24   contrast, the cited portion of the Clerk's Transcript does not show either statement.  See

25   Ans., Ex. A at 225:27-227:3 (the prosecution notes on the record that defense counsel has

26   misrepresented the video).  Petitioner has again misrepresented the record, which does not

27   show the victim encouraging her children to lie.  Because there is nothing helpful to

28

Order Denying Petition for Writ of Habeas Corpus; Denying COA
P:\PRO-SE\EJD\HC.18\01738Jones_denyHC

United States District Court
Northern District of California

1  Petitioner in the cited portions of the record, his counsel was not ineffective for deciding

2  not to introduce it.

3        Finally, as noted above, the evidence against Petitioner was overwhelming.  The

4  victim testified as to his kidnapping of and beating her, and her testimony was

5  corroborated by her children's testimony, police testimony, physical evidence, and medical

6  records.  Even if trial counsel had been ineffective in failing to introduce this evidence –

7  which he was not, as the evidence did not help Petitioner – it is not "reasonabl[y]

8  probab[le]" that the jury would have reached a different verdict had it heard this evidence.

9  See Strickland, 466 U.S. at 694.

10        **c.  Alleged failure to impeach the victim**

11        Petitioner argues that his counsel was ineffective in failing to impeach the victim

12  with inconsistent testimony.  Specifically, Petitioner notes that the victim stated in her

13  police interview that she lost consciousness after Petitioner kicked her in the head, see Pet.,

14  Ex. J at 210-14, but that in a preliminary hearing and at trial the victim testified that she

15  lost consciousness after Petitioner hit her in the head with a hammer, see Ans., Ex. A at

16  118:8-10, 189:16-18, Ans., Ex. B at 285:14-20.  However, having reviewed the victim's

17  statement to the police, the Court notes that the victim also told police that she blacked out

18  after being hit in the head with a hammer, see Pet., Ex. J at 164-66 ("[Petitioner] grabs a

19  hammer and just barns me in the head, and. . .  I - I blacked out . . . ."), and that she was

20  unsure of the mechanism but knew that Petitioner struck her in the head such that she

21  blacked out, see id. at 968-70 ("I don't know if he kicked in the head, hit me in the head

22  with the ha- I don't know what he did.  I blacked out.").

23        As the victim told the police that Petitioner hit her in the head with a hammer

24  causing her to black out, and gave the same testimony in a preliminary hearing and at trial,

25  the victim does not appear to have testified inconsistently.  Because the victim was not

26  inconsistent, counsel was not ineffective in choosing not to attempt to impeach her with

27  her prior statements regarding whether Petitioner struck her in the head with a hammer or

28

39

1   with his foot.  Moreover, as Respondent notes, introducing evidence that Petitioner kicked

2   the victim in the head in addition to having struck her in the head with a hammer may have

3   hurt Petitioner's case.  See Supp. Ans. at 26.  This "evidence would have made a

4   difference, but in the wrong direction," and counsel was reasonable in electing to exclude

5   that evidence.  Wong, 558 U.S. at 22.

6       Because the victim's statements were not inconsistent, and any attempt to impeach

7   her with them would have introduced evidence of further abuses by Petitioner, counsel was

8   not ineffective in choosing not to impeach the victim with the alleged inconsistency

9   between being kicked in the head and hit in the head by Petitioner.

10      **d.  Alleged failure to impeach Child 1**

11      Petitioner claims that counsel should have impeached Child 1 regarding the child's

12  statements that he saw his father standing over the victim, yelling and hitting her.  Pet. at

13  96-97.  As discussed, supra B.4.a.iv, Child 1's statements were not inconsistent.

14  Accordingly, counsel was not ineffective for deciding not to attempt to impeach Child 1

15  with those statements; there was no ground for impeachment.

16      **e.  Alleged failure to object to prosecutorial misconduct**

17      Petitioner claims that counsel was ineffective for failing to object to misleading

18  statements by the prosecutor.  Specifically, Petitioner argues that counsel should have

19  objected to the prosecutor's statements in opening and closing arguments "that [the victim]

20  was 'beat' the entire time she was in Petitioner['s] home."  Pet. at 93 (citing Ans., Ex. B at

21  43-44, 46, 424, 426-27).

22      A defendant's due process rights are violated when a prosecutor's misconduct

23  renders a trial "fundamentally unfair."  Darden, 477 U.S. at 181.  Under Darden, the first

24  issue is whether the prosecutor's remarks were improper; if so, the next question is

25  whether such conduct infected the trial with unfairness.  Tan, 413 F.3d at 1112; see also

26  Deck, 768 F.3d at 1023 (recognizing that Darden is the clearly established federal law

27  regarding a prosecutor's improper comments for AEDPA review purposes).  A

28

United States District Court
Northern District of California

40

United States District Court
Northern District of California

prosecutorial misconduct claim is decided "'on the merits, examining the entire proceedings to determine whether the prosecutor's remarks so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Johnson, 63 F.3d at 929; see Trillo, 769 F.3d at 1001 ("Our aim is not to punish society for the misdeeds of the prosecutor; rather, our goal is to ensure that the petitioner received a fair trial."). Even if there was misconduct, a habeas petitioner is not entitled to relief unless the misconduct "'had substantial and injurious effect or influence in determining the jury's verdict.'" Brecht, 507 U.S. at 637 (quoting Kotteakos, 328 U.S. at 776). In other words, state prisoners seeking federal habeas relief may obtain plenary review of constitutional claims of trial error, but are not entitled to habeas relief unless the error resulted in "actual prejudice." Id. (citation omitted); see e.g., Johnson, 63 F.3d at 930 (finding prosecutorial vouching "could not have had substantial impact on the verdict necessary to establish reversible constitutional error" under Brecht).

Here, the record reveals that the challenged statements were not misconduct, and so counsel was not ineffective in failing to object to them. First, nowhere in the record does the prosecutor state that Petitioner beat the victim "the entire time," as Petitioner misrepresents. Rather, the prosecutor stated in opening arguments that "hit [the victim] with this [pole], all ten of those days." Ans., Ex. B at 43:10-11. The prosecutor characterized this as "he essentially, he beat her." Id. at 43:28; see also id. at 46:6 ("Ten days of her getting beaten . . . ."). This was not a misstatement, as the victim testified that Petitioner "hit [her] with . . . the stick . . . throughout the course" of her captivity. Id. at 233:18-21. In closing arguments, the prosecutor stated that Petitioner "beat her during the duration of these ten days. He didn't do it all on day one. . . . It was a duration of beatings that took place over the course of time and her injuries show or are reflective that he beat her over time." Id. at 426:5-10; see also 427:1-2 ("It's not just one beating. It's many beatings throughout the course of ten days."). Again, this is consistent with the victim's testimony and does not misstate the evidence.

41

1

2

3

4

5

6

7

8

9

10

11

United States District Court
Northern District of California

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

To the extent Petitioner intended to argue not that the prosecutor mischaracterized the evidence, but that the prosecutor's statements were inflammatory – which Petitioner did not claim in the Petition – the Court would disagree with such an argument.  First, the victim characterized the Petitioner's actions as "beating on me," and so the prosecutor was merely using the same words as a witness. Ans., Ex. B at 217:26; see also id. at 219:12 ("he's beating me").  A prosecutor is permitted to summarize trial testimony and to use the victim's words in doing so, as the prosecutor did here.  See United States v. Kootswatewa, 893 F.3d 1127, 1136 (9th Cir. 2018) (no misconduct where prosecutor "accurately recited the trial testimony," using the victim's own words); United States v. Younger, 398 F.3d 1179, 1191 (9th Cir. 2005) (a prosecutor is allowed to "marshal evidence actually admitted at trial and reasonable inferences from that evidence"); see also United States v. Martinez, 484 F. App'x 177, 178–79 (9th Cir. 2012) (approving statements that "were a rhetorical device used to summarize the evidence and describe permissible inferences").

Second, describing Petitioner's actions as "beating" seems, if anything, less inflammatory than repeatedly stating that Petitioner struck the victim in the head multiple times with a hammer and hit her body with a pole "the size of a closet rod." Ans., Ex. B at 43:9-10.  Stating that the Petitioner "beat" the victim is not so inflammatory as to justify overturning the state courts' decisions.  Indeed, courts have refused to overturn convictions where the prosecutor made statements far more inflammatory.  See Darden, 477 U.S. at 181 & n.12 (no habeas relief where the prosecutor said the defendant was "an animal" who "shouldn't be out of his cell unless he has a leash on him," and repeatedly wished that defendant had been killed, because, in light of the evidence, the comments had not  "so infected the trial with unfairness as to make the resulting conviction a denial of due process"); see also Turner v. Marshall, 63 F.3d 807, 818 (9th Cir. 1995) (no habeas relief where prosecutor called the defendant a "monster of a human being"), overruled on other grounds by Tolbert v. Page, 182 F.3d 677, 685 (9th Cir. 1999) (en banc).

1    Because the prosecutor's opening and closing statements were neither

2   mischaracterizations nor inflammatory, there was simply nothing for defense counsel to

3   object to; any objection would have been meritless.  Accordingly, the state court's

4   rejection of this claim was not unreasonable, because counsel did not give an incompetent

5   performance in the trial court.  See Siripongs v. Calderon, 133 F.3d 732, 737 (9th Cir.

6   1998).

7    Finally, even if the prosecutor had engaged in misconduct – which he did not – any

8   failure to object would not have prejudiced Petitioner in the context of this case.  As noted

9   several times above, the evidence against Petitioner was overwhelming.  The victim

10  testified at length regarding Petitioner's kidnapping and beating of her, and her testimony

11  was corroborated by testimony from her children, physical evidence, police testimony, and

12  medical records.  In light of all this evidence, the Court cannot conclude that Petitioner

13  was prejudiced by the prosecutor's statements.

### f.  Argument that counsel should have withdrawn

15   Finally, Petitioner claims that trial counsel should have withdrawn from the case

16  because he lacked the time necessary to prepare.[10]  See Pet. at 90-93, 104-05.

17   First, Petitioner may only succeed on a conflict claim if he can show an "actual

18  conflict . . . that adversely affects counsel's performance" rather than a "mere theoretical

19  division of loyalties."  Mickens v. Taylor, 535 U.S. 162, 171-72 & n.5 (2002).  There is an

20  actual conflict of interest between an attorney and client if, during the course of the

21  representation, the attorney's and client's interests "diverge with respect to a material

22  factual or legal issue or to a course of action."  Cuyler v. Sullivan, 446 U.S. 335, 356 n.3

23  (1980).  The "adverse effect" is shown if some plausible alternative defensive strategy or

24  tactic might have been pursued but was not and the alternative defense was inherently in

---

[10] The Court notes that, although Petitioner uses the phrase "conflict of interest," Petitioner intends to refer to "when an attorney is compelled by his or her excessive caseload to choose between the right[s] of the various indigent defendants he or she is representing," Supp. Traverse at 25, rather than a situation in which an attorney's clients' legal interests are opposed.

Order Denying Petition for Writ of Habeas Corpus; Denying COA
P.\PRO-SE\EJD\HC.18\01738Jones_denyHC

United States District Court
Northern District of California

1    conflict with or not undertaken due to the attorney's other loyalties or interests.  <u>United

2    States v. Wells</u>, 394 F.3d 725, 733 (9th Cir. 2005).  Moreover, because there is no

3    presumed prejudice (that being reserved for a simultaneous representation of co-

4    defendants), Petitioner must still show prejudice under <u>Strickland</u>, 466 U.S. 668.

5           Here, Petitioner fails at the first hurdle.  Petitioner attempts to claim that his counsel

6    was conflicted because counsel was too busy to prepare for Petitioner's trial.  <u>See</u> Pet. at

7    111-13.  However, simply being busy does not present an "actual conflict" within the

8    meaning of Supreme Court precedent.  <u>See, e.g., United States v. Zackson</u>, 6 F.3d 911, 921

9    (2d Cir. 1993) (refusing to treat "enormous time constraints in regard to prior trial

10   commitments" as a conflict of interest); <u>Zaker v. McQuiggin</u>, No. 13-cv-1229, 2013 WL

11   11259534, at *3 (6th Cir. Sept. 11, 2013) (unpublished) ("Hypothetical conflicts and busy

12   schedules are not substantive evidence of actual conflict."); <u>United States v. Peters</u>, 232

13   F.3d 903 (10th Cir. 2000) (unpublished) ("The fact that Mr. Peters' second ineffective

14   assistance claim alleged that the busy trial schedule of one of his attorneys created a

15   'conflict of interest' does not bring that claim within the scope of <u>Cuyler v. Sullivan</u>, 446

16   U.S. 335 (1980).").  This is an ineffective assistance claim, not a deprivation of counsel

17   claim.  The Court has already found, <u>supra</u> B.5, that trial counsel was not ineffective.

18          Second, even assuming that counsel would have performed better had there been

19   more time to prepare, the time constrains faced by trial counsel were of Petitioner's

20   making.  As the state appellate court noted, Petitioner simultaneously refused to waive his

21   state-derived speedy trial rights, and

22                    failed to make a sincere attempt to retain counsel. [Petitioner]
                      balked at paying a retainer or making other arrangements to pay
23                    counsel, despite the public defender's finding he was not
                      indigent.  And at one point early on in the process, [Petitioner]
24                    indicated he did not intend to contact any more attorneys about
                      representing him.  As the trial court found, [Petitioner] was the
25                    one who dragged out the process.  Eventually, the court was
                      forced to find [Petitioner] indigent and appoint an attorney for
26                    him.

27   <u>Jones</u>, 2017 WL 412629, at *4.  It would be exceedingly odd to allow Petitioner to put trial

28

44

United States District Court
Northern District of California

1  counsel in a position where Petitioner contends trial counsel did not have time to prepare,

2  and then grant habeas relief based on Petitioner's choice.

3       Third, as Respondent notes, Petitioner's appointed counsel was "the only attorney,

4  despite numerous inquiries, who was willing to take [Petitioner's] case."  Supp. Ans. at 23.

5  Thus, if trial counsel had withdrawn, Petitioner may have faced his criminal trial without

6  the benefit of any counsel.  The Court is reluctant to hold that Petitioner was prejudiced by

7  having allegedly unprepared counsel, when the alternative was no counsel at all.

8       Because it does not appear that counsel's alleged lack of preparation led to errors or

9  prejudiced Petitioner, and because the alternative to allegedly unprepared counsel would

10 have been even worse, the Court finds that Petitioner has not demonstrated that he was

11 prejudiced by counsel's failure to withdraw.  Accordingly, this claim fails.

12      For the reasons above, Petitioner's claims based on allegedly ineffective assistance

13 of trial counsel are DENIED.

14      **6.**     **Claims for Ineffective Assistance of Appellate Counsel**

15      Petitioner contends that he received ineffective assistance of appellate counsel, in

16 that appellate counsel failed to argue that (a) there was insufficient evidence to support the

17 charge for torture (Count 1); (b) there was insufficient evidence to support the charge for

18 kidnapping for ransom (Count 2); (c) there was insufficient evidence to support the

19 enhancements for personal use of a deadly weapon and great bodily injury; (d) the charge

20 for false imprisonment by violence (Count 10) was legally unsound; (e) the charges for

21 child abuse (Counts 14-18) were legally unsound; and (f) the charge for false

22 imprisonment using a hostage was legally unsound.  See Pet. at 63-69.

23      Because these claims were presented for the first time in a state habeas petition in

24 the state high court and were summarily denied, the Court must conduct an independent

25 review of the record to determine whether the state court's decision was an objectively

26 unreasonable application of clearly established federal law.  Plascencia, 467 F.3d at 1198.

27 The Court will discuss each claim individually.

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

The Due Process Clause of the Fourteenth Amendment guarantees a criminal defendant the effective assistance of counsel on his first appeal as of right.  Evitts v. Lucey, 469 U.S. 387, 391–405 (1985).  Claims of ineffective assistance of appellate counsel are reviewed according to the standard set out in Strickland, 466 U.S. 668.  See Smith v. Robbins, 528 U.S. 259, 285 (2000); Moormann v. Ryan, 628 F.3d 1102, 1106 (9th Cir. 2010): Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989).  First, the petitioner must show that counsel's performance was objectively unreasonable, which in the appellate context requires the petitioner to demonstrate that counsel acted unreasonably in failing to discover and brief a merit-worthy issue.  Smith, 528 U.S. at 285; Moormann, 628 F.3d at 1106.  Courts indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.  See Strickland, 466 U.S. at 689. Second, the petitioner must show prejudice, which in this context means that the petitioner must demonstrate a reasonable probability that, but for appellate counsel's failure to raise the issue, the petitioner would have prevailed in his appeal.  Smith, 528 U.S. at 285–86; Moormann, 628 F.3d at 1106.

It is important to note that appellate counsel does not have a constitutional duty to raise every nonfrivolous issue requested by defendant.  See Jones v. Barnes, 463 U.S. 745, 751–54 (1983); Gerlaugh v. Stewart, 129 F.3d 1027, 1045 (9th Cir. 1997); Miller, 882 F.2d at 1434 n. 10.  The weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy.  See id. at 1434.  Appellate counsel therefore will frequently remain above an objective standard of competence and have caused his client no prejudice for the same reason—because he declined to raise a weak issue.  Id.

### a.  Torture charge

Petitioner first claims that there was insufficient evidence to support the charge for torture with use of a deadly weapon and causing great bodily injury (Count 1).  See Pet. at 63-65.  Specifically, Petitioner argues that the victim's DNA was not found on the weapons Petitioner used to beat her, id. at 63, that the victim did not suffer any broken

bones, id. at 64, and the victim did not suffer from internal bleeding, id. at 65. Petitioner

argues that appellate counsel was ineffective in failing to argue that the evidence was

insufficient to support this count.  See id. at 63.  Respondent answers that the victim's

testimony amply demonstrated that the elements of a torture charge were fulfilled.  See

Ans. at 7-8.

Applying the legal standard for ineffective assistance of appellate counsel

articulated above, the Court finds that Petitioner fails to demonstrate that this claim was

merit-worthy or that appellate counsel acted unreasonably in failing to raise this issue on

appeal.  In evaluating an insufficiency of the evidence claim, California courts

> must review 'the whole record in the light most favorable to the
> judgment' and decide 'whether it discloses substantial evidence
> ... such that a reasonable trier of fact could find the defendant
> guilty beyond a reasonable doubt.' . . .  Under this standard, the
> court does not " 'ask itself whether *it* believes that the evidence
> at the trial established guilt beyond a reasonable doubt." . . .
> Instead, the relevant question is whether, after viewing the
> evidence in the light most favorable to the prosecution, any
> rational trier of fact could have found the essential elements of
> the crime beyond a reasonable doubt.' . . . .

People v. Hatch, 22 Cal. 4th 260, 272 (Cal. 2000) (citations omitted).

The Court agrees with Respondent.  California Penal Code Section 206, which

Petitioner was charged with violating, states:

> Every person who, with the intent to cause cruel or extreme pain
> and suffering for the purpose of revenge, extortion, persuasion,
> or for any sadistic purpose, inflicts great bodily injury as defined
> in Section 12022.7 upon the person of another, is guilty of
> torture. [¶] The crime of torture does not require any proof that
> the victim suffered pain.

Cal. Pen. Code § 206.  "As the statute states, torture has two elements: (1) a person

inflicted great bodily injury upon the person of another, and (2) the person inflicting the

injury did so with specific intent to cause cruel and extreme pain and suffering for the

purpose of revenge, extortion, persuasion, or for any sadistic purpose."[11]  People v. Baker,

---

[11] Petitioner did not argue in the Petition that there was insufficient evidence to support the

United States District Court
Northern District of California

98 Cal. App. 4th 1217, 1223 (2002).  It is well-settled that "Section 206 does not require permanent, disabling, or disfiguring injuries . . .  Abrasions, lacerations and bruising can constitute great bodily injury."  People v. Pre, 117 Cal. App. 4th 413, 420 (2004) (citation omitted).  Here, there was ample evidence that the victim sustained injuries over her entire body after having been beaten repeatedly for ten days with fists, a pole, and a hammer.  See Ans., Ex. B at 350:14 (victim had bruising to her left eye), 423:27 (knot on forehead), 424:12-13 (mark on the back of her head, still bleeding), 425:10 (right side of the face), 426:12 (buttocks), 426:22 (behind the ear).[12]

After carefully reviewing the record and the relevant standards, this Court cannot say that the state court was unreasonable in concluding that there was no ineffective assistance of appellate counsel.  A reasonable juror could easily have found from the injuries over the entirety of the victim's body that Petitioner tortured the victim and produced great bodily injury.  Thus, any sufficiency of the evidence claim would have been meritless, and appellate counsel reasonably declined to raise this sufficiency of the evidence issue on appeal.  The Court therefore denies Petitioner habeas relief on this claim.

### b.  Kidnapping for ransom charge

Petitioner next claims that there was insufficient evidence to support the charge of kidnapping for ransom (Count 2).  See Pet at 65-67.  Specifically, Petitioner notes that "the ransom was drugs and a car," id. at 65, and argues that the charge cannot stand because "Petitioner did not kidnap [the victim] for pills, drugs," id. at 66, and that the car cannot be considered ransom because the victim did not fill out the transfer documents correctly, id. at 67.

_____

second element.  See generally, Pet. at 63-65.  Had he raised such an argument, the Court agrees with Respondent that it would fail.  See Ans. at 10.  The victim testified that the Petitioner said he was beating her because he believed she had stolen from him and would take his children to a shelter.  See, e.g., Ans., Ex. B at 219:10-13.  A reasonable juror could thus find Petitioner was beating the victim out of revenge.  Similarly, a reasonable juror could have found that Petitioner had a sadistic purpose, because  it is difficult to see how ten days' of beatings could serve any purpose other than a sadistic one.
[12] As explained supra, there is no evidence to support Petitioner's contention that the victim inflicted her own injuries.

Order Denying Petition for Writ of Habeas Corpus; Denying COA
P:\PRO-SE\EJD\HC.18\01738Jones_denyHC

United States District Court
Northern District of California

United States District Court
Northern District of California

Respondent answers that the evidence amply supports a charge of kidnapping for ransom, see Supp. Ans. at 14-15, and the Court agrees.  The record shows that Petitioner repeatedly demanded that the victim give him money and pills, see Ans., Ex. B at 225:3-6, 228:7-13, and hit her with a hammer when she could not or would not tell him where to obtain these items, see id. at 228:11-13.  The record also shows that Petitioner beat the victim until she agreed "to give [her] car to him.  He told [the victim she] had to give [her] car to him."  Id. at 245:3-8.

It is apparent that at least part of Petitioner's motive in kidnapping the victim, keeping her captive, and beating her, was to obtain her car and either drugs or money.  A reasonable jury could thus have found the elements of a torture charge were met.  Because any claim based on insufficiency of the evidence would have been meritless, appellate counsel was not ineffective for deciding not to raise such a doomed claim.

### c.  Personal use of a deadly weapon, great bodily injury

Petitioner's third claim for ineffective assistance of appellate counsel is that counsel should have raised an insufficiency of evidence argument as to the enhancements for personal use of a deadly weapon and great bodily injury.  See Pet. at 67-69.  Specifically, Petitioner argues that the victim's DNA was not found on the hammer, see id. at 67-69, and that the victim's injuries were insufficient to warrant this charge, see id. at 68.

As to the first argument, as explained above there was ample evidence that Petitioner hit the victim with a hammer, both in the form of the victim's testimony and in the form of a partial DNA match between the victim and the genetic material collected from the hammer.

As to the second argument, the Court has already referred to the victim's extensive injuries, above.  "Great bodily injury" as defined in California law "contains no specific requirement that the victim suffer 'permanent,' 'prolonged' or 'protracted' disfigurement, impairment, or loss of bodily function."  People v. Escobar, 3 Cal. 4th 740, 750 (1992).  Rather, the California Supreme Court has explained that a jury may find the defendant

49

1
2
3
4
5
6

inflicted great bodily injury upon his victim when his attack caused "extensive bruises and abrasions over the victim's legs, knees and elbows, injury to her neck and soreness in her vaginal area of such severity that it significantly impaired her ability to walk." Id.  This standard easily encompasses the injuries Petitioner inflicted here, see Ans., Ex. B at 423:27- 426:22 (chronicling some of the victim's injuries), and so a reasonable jury could have found that Petitioner inflicted great bodily injury upon the victim.

7
8
9

Accordingly, appellate counsel was not ineffective for choosing not to challenge sufficiency of the evidence with respect to the deadly weapon and great bodily injury enhancements, as this would have been a meritless argument.

10

### d.  False imprisonment by violence

11
12
13
14
15

Petitioner's fourth ineffective assistance of appellate counsel claim is that appellate counsel should have argued that the charge for false imprisonment by violence (County 10) was legally unsound.  See Pet. at 69.  Specifically, Petitioner argues that because he never "sa[id] anything" to indicate that the victim was not free to leave, "thus, [she was] free to leave." Id.

16
17
18
19
20
21
22
23
24
25
26

However, as Respondent notes, the record amply supports the conclusion that Petitioner made it clear the victim was not free to leave.  See Supp. Ans. at 19.  First, it is apparent that Petitioner neither let the victim out of his sight nor let her have a means of communication for the entire ten days she was held captive.  See Ans., Ex. B at 237:2-7 ("Q:  Was there ever the point during this set of days where you were alone in the house that you can remember?  A.  No.  Q.  Was there ever a point during the course of this time where you had a phone or some form of communication?  A.  No."); see also id. at 249:12-25 (the victim was only able to call for assistance after her child hid a cell phone for the victim's use).  As Respondent notes, a reasonable jury could conclude from this information that Petitioner held the victim captive by means of menace or force.  See Supp. Ans.. at 20.

27
28

United States District Court
Northern District of California

Second, the record reveals that when the victim attempted to escape through the back door of Petitioner's basement, Petitioner hit the victim in the head with a hammer. See id. at 216:3-5 ("[W]hen I tried to get out I got the first – I got the first lock off and he hit me in the head with a hammer."). Petitioner did so again when the victim attempted to escape out of the garage door. See id. at 221:12-16 ("I tried to run out again. It was my only chance and I tried to run out when I got exactly to the garage door before he put it down, I tried to run out, and he just bashed me in the head right here with the hammer on my forehead."). A reasonable juror could conclude that, as both of the victim's escape attempts immediately resulted in Petitioner hitting the victim in the head with a hammer, the victim was not free to leave.

Because any argument regarding the sufficiency of the evidence on the false imprisonment charge would have been meritless, appellate counsel was not ineffective for deciding not to bring such an argument.

### e. Child abuse

Petitioner's fifth claim for ineffective assistance of appellate counsel is that the charges for child abuse were legal unsound (Counts 14-18). See Pet. at 69. Specifically, Petitioner argues that these charges cannot stand because neither an expert nor the children testified. See id.

As Respondent notes, the record amply supports the conclusion that Petitioner "willfully cause[d] or permit[ted] [the children] to suffer, or inflict[ed] thereon unjustifiable physical pain or mental suffering." Cal. Penal Code § 273a(a). A reasonable juror could have found that, by forcing his children to witness his kidnapping and torture of their mother, Petitioner "inflicted . . . unjustifiable . . . mental suffering" upon the children. For example, while Petitioner held the victim captive, he also refused to allow his children to leave the house. See Ans., Ex. B at 441:2-3. Petitioner also forced his children to listen to their mother's screams as he beat her, see id. at 441:20-27, and kept the children inside the house with him for nine hours while in a standoff with police, see

1     id. at 442:8-24.  From these facts, a reasonable juror could easily have found that Petitioner

2     placed his children in danger and inflicted unjustifiable mental suffering upon them.

3         Because any challenge to the sufficiency of the evidence on the child abuse charge

4     would have been meritless, appellate counsel was not ineffective for failing to raise this

5     argument.

6                         **f.   False imprisonment using a hostage**

7         Petitioner's sixth and final claim that appellate counsel was ineffective challenges

8     appellate counsel's decision not to argue that the charge for false imprisonment using a

9     hostage was legally unsound.  See Pet. at 69.  Specifically, Petitioner argues that he did not

10    use his child as a shield.  See id.

11        The record does not support Petitioner's argument.  Rather, a police offer testified

12    that

13                As I came from the front part of the house towards the rear, it
              was a -- I don't know if it was a living room or makeshift
14            bedroom, but I came around, I saw Mr. Jones standing there
              holding a female infant in front of him and was yelling at us.
15

16    Ans., Ex. B at 177:21-25.  Upon follow-up questioning, the officer re-stated that Petitioner

17    "had the child up in front of him," and the officer "perceived . . . [Petitioner] was using

18    the child as a human shield."  Id. at 178:2-3.

19        Petitioner represents that he has new video footage which shows that the officer was

20    lying.  See Dkt. No. 53.  Specifically, Petitioner contends that footage shows Petitioner

21    held his daughter on his right hip, rather than in front of his chest.  See id.

22        First, the officer did not testify that Petitioner held his daughter in front of his chest.

23    Instead, the officer said that the daughter was "up in front of him."  An object may both be

24    held on the hip and be somewhat "in front of" the body, and an infant could only be at the

25    height of an adult's hip if she were held "up."  Even assuming the new video footage is as

26    Petitioner describes, [13] this does not mean that the officer was lying.

27

28    [13] Although Petitioner provided the Court with "a photo copy" of the compact disc, rather

United States District Court
Northern District of California

1    Second, the record reveals that reasonable jurors could have concluded that

2 Petitioner used his daughter as a human shield without relying on the officer's testimony.

3 Video footage from two officers' body cameras was played for the jury.  See Ans., Ex. B

4 at 181:5-182:6; 183:2-22.  The prosecution noted, and Petitioner did not contradict, that

5 this video footage captured the scene from two different angles.  See id. at 182:28.  Nor

6 was the jury shown a mere moment of the scene; rather, the jury watched more than four

7 minutes of footage from the first body camera, and five minutes of footage from the

8 second.  See id. at 182:2-4, 183:17-19.  The jury thus had ample direct evidence – multiple

9 minutes of footage from multiple angles – on which to base its conclusion that Petitioner

10 used his daughter as a human shield.

11    Finally, even if Petitioner held his daughter up and to the side rather than in front,

12 this does not preclude a conclusion that he was using his daughter as a human shield.  The

13 officer testified that he lowered his rifle because of the presence of the child, not

14 specifically because the child was held in front of Petitioner's chest.  See id. at 178:11-14.

15 Even if Petitioner held the child to the side, a reasonable juror could conclude that

16 Petitioner intended the child's presence to dissuade officers from shooting him.  Accord id.

17 at 185:10-16 (explaining other ways officers change their behavior when children are in

18 the house, to avoid injuring children).

19    Accordingly, a reasonable jury could conclude, that Petitioner was using the child

20 as a hostage to ensure Petitioner's safety.  In other words, a jury could reasonably conclude

21 from this evidence that Petitioner "commit[ted] the offense of false imprisonment, . . .

22 against [his daughter]. . .  for purposes of using [his daughter] as a shield."  Cal. Penal

23 Code § 210.5 (defining the crime of false imprisonment using a hostage).

24    Because the evidence was sufficient for the jury to conclude that Petitioner had

25 committed this crime, any argument challenging the sufficiency of the evidence would

26

27 _____

than the video footage itself, neither the Court's nor Petitioner's interpretation of this
footage matters.  Rather, the key question is whether any reasonable juror could have
28 viewed this footage and concluded that Petitioner "was using the child as a human shield."

1  have been meritless.  Accordingly, appellate counsel was not ineffective for deciding not

2  to raise a meritless argument.

3      For the reasons above, Petitioner's claims based on allegedly ineffective assistance

4  of appellate counsel are DENIED.

5      **7.      Claims for Structural Error**

6      Petitioner contends that he suffered structural error, in that (a) defense counsel had a

7  conflict of interest; (b) Petitioner lacked counsel for 73 days after the withdrawal of his

8  public defender; (c) the trial court denied Petitioner's request for funds necessary to obtain

9  expert witnesses;  (d) the trial court ordered defense counsel to cease investigations on

10 Petitioner's behalf; (e) the trial court refused to hear Petitioner's motion for dismissal on

11 the basis of a speedy trial violation; (f) after the jury began deliberating, the trial court

12 allowed the prosecutor to reopen the case; and (g) after the case was reopened, the trial

13 court refused to allow Petitioner to respond to that new evidence.  See Pet. at 110-18.

14     Because these claims were presented for the first time in a state habeas petition in

15 the state high court and were summarily denied, the Court must conduct an independent

16 review of the record to determine whether the state court's decision was an objectively

17 unreasonable application of clearly established federal law.  Plascencia, 467 F.3d at 1198.

18 First the Court will discuss Claims 7(a) and 7(b) together, as both relate to Petitioner's

19 access to counsel.  The Court will then discuss the remaining five structural error claims.

20     There are two broad types of constitutional errors that may occur during the course

21 of a criminal proceeding: trial error and structural error.  Hardnett v. Marshall, 25 F.3d

22 875, 879 (9th Cir. 1994).  Structural error is a "defect affecting the framework within

23 which the trial proceeds, rather than simply an error in the trial process itself." Arizona v.

24 Fulminante, 499 U.S. 279, 310 (1991).  Accordingly, where a criminal proceeding is

25 undermined by a structural error, the "criminal trial cannot reliably serve its function as a

26 vehicle for determination of guilt or innocence," and the defendant's conviction must be

27 reversed.  Id.  Only in those limited cases where the constitutional deprivation affects "the

28

1   framework within which the trial proceeds," is the integrity of trial process so

2   compromised that the "criminal trial cannot reliably serve its function as a vehicle for

3   determination of guilt or innocence." Id.  These cases are rare and require automatic

4   reversal, Washington v. Recuenco, 548 U.S. 212, 218 (2006); Brecht, 507 U.S. at 629-30,

5   whether on direct or habeas review, Powell v. Galaza, 328 F.3d 558, 566 (9th Cir. 2003).

6       The list of Supreme Court cases in which structural error analysis has been found to

7   apply is short.  Campbell v. Rice, 408 F.3d 1166, 1172 (9th Cir. 2005).  They are: Sullivan

8   v. Louisiana, 508 U.S. 275, 281 (1993) (beyond a reasonable doubt standard); Vasquez v.

9   Hillery, 474 U.S. 254, 264 (1986) (unlawful exclusion of member of defendant's race from

10  grand jury); Waller v. Georgia, 467 U.S. 39, 49-50, 49 n.9 (1984) (right to public trial);

11  McKaskle v. Wiggins, 465 U.S. 168, 177-78 n.8 (1984) (violation of right to self-

12  representation at trial); Gideon v. Wainwright, 372 U.S. 335, 344-45 (1963) (deprivation

13  of right to counsel); and Tumey v. Ohio, 273 U.S. 510, 531-32 (1927) (trial by biased

14  judge).  Campbell, 408 F.3d at 1172.  See also Herring v. New York, 422 U.S. 853, 858-

15  59, 863-65 (1975) (total denial of closing argument constituted structural error).  Since

16  Campbell, the Supreme Court expressly has found structural error in just three other

17  situations.  See McCoy v. Louisiana, 138 S. Ct. 1500, 1511 (2018) (a criminal defendant

18  has the right to decide the objectives of his defense); Williams v. Pennsylvania, 136 S. Ct.

19  1899, 1909 (2016) (interested judge's unconstitutional failure to recuse himself from a

20  multi-member appellate panel was structural error, even if he did not cast a deciding vote);

21  United States v. Gonzalez-Lopez, 548 U.S. 140, 150 (2006) (denial of individual's right to

22  counsel of choice is structural error); see also Ramos v. Louisiana, 140 S. Ct. 1390, 1407

23  (2020) (holding that the Sixth Amendment right to a jury trial requires a unanimous verdict

24  to convict a defendant of a serious offense, but not expressly holding that the violation of

25  this right constitutes structural error).

26      Some cases in which the Ninth Circuit has found structural error are: Cordova v.

27  Baca, 346 F.3d 924, 930 (9th Cir. 2003) (violation of right to counsel not effectively

United States District Court
Northern District of California

28

55

waived where trial court failed to provide <u>Faretta</u> warnings to defendant representing himself); <u>Powell</u>, 328 F.3d at 566-67 (holding mandatory presumption in jury instruction which deprives defendant of a verdict decided by a jury violated the Sixth Amendment); <u>Sheppard v. Rees</u>, 909 F.2d 1234, 1237-38 (9th Cir. 1989) (denial of right to be informed of nature and cause of criminal accusation).

### a. <u>Petitioner's counsel-related structural error claims</u>

Petitioner claims that he was subjected to structural error because he was without counsel for a period of time between his invocation of his right to counsel and his arraignment, and because his defense counsel had a conflict of interest.

As to the former claim, as noted <u>supra</u> B.1, Petitioner's right to counsel had not yet attached during the time he was without counsel.  Moreover, as explained <u>supra</u> B.1 and B.5, Petitioner's counsel was not ineffective during Petitioner's criminal trial, and the Court cannot conclude that Petitioner was prejudiced in light of the overwhelming evidence against Petitioner.  <u>See Gomez-Velazco</u>, 879 F.3d at 993–94 ("[T]he Supreme Court has held that denial of counsel at the preliminary hearing stage is subject to harmless error review rather than an automatic reversal rule.").  This claim therefore fails.

As to the latter claim, it is not clear whether Petitioner intends to challenge the public defender's declaration of a conflict barring the public defender from representing Petitioner, <u>see</u> Pet. at 110, or whether Petitioner intends to argue that the attorney who represented Petitioner at trial had a conflict with Petitioner, <u>see id.</u> at 111-12 (suggesting that the attorney had a conflict of interest due to his busy schedule).

To the extent Petitioner's claim is based on the public defender's conflict of interest, the Court notes that the public defender declared a conflict to <u>avoid</u> representing Petitioner.  <u>See</u> Ans., Ex. A at 19:19-20.  This was entirely proper, and Petitioner was never represented by a conflicted attorney from the public defender's office.  To the extent Petitioner wishes he had been represented by an attorney from the public defender's office, this does not state a cognizable claim because a criminal defendant who cannot afford to

56

United States District Court
Northern District of California

1   retain counsel has no right to counsel of his own choosing.  See Wheat v. United States,

2   486 U.S. 153, 159, 164 (1988).  Accordingly, this claim would fail.

3          To the extent Petitioner intends to base his claim on trial counsel's performance, as

4   explained, supra B.5.f, the fact that trial counsel has a busy practice does not create a

5   conflict of interest between trial counsel's other clients and Petitioner.  Nor has Petitioner

6   shown that trial counsel's busy schedule rendered trial counsel ineffective,

7          Accordingly, Petitioner's counsel-based structural errors claims fail.

8                 **b.  Petitioner's other structural error claims**

9          As noted above, Petitioner complains, inter alia, that he suffered structural error

10  because the trial court denied Petitioner's request for funds necessary to obtain expert

11  witnesses; the trial court ordered defense counsel to cease investigations on Petitioner's

12  behalf; the trial court refused to hear Petitioner's motion for dismissal on the basis of a

13  speedy trial violation; after the jury began deliberating, the trial court allowed the

14  prosecutor to reopen the case; and after the case was reopened, the trial court refused to

15  allow Petitioner to respond to that new evidence.  None of these alleged errors has been

16  identified as a structural error by the Supreme Court or the Ninth Circuit, see supra B.7,

17  and so these structural error claims are not cognizable.

18         Even if the Court analyzes these claims as trial errors, rather than structural errors,

19  the claims fail on the merits.  Trial error is error "which occurred during the presentation

20  of the case to the jury, and which may therefore be quantitatively assessed in the context of

21  other evidence presented in order to determine whether its admission was harmless."

22  Fulminante, 499 U.S. at 307-08.  This type of constitutional error encompasses those errors

23  "which in the setting of a particular case are so unimportant and insignificant that they

24  may, consistent with the Federal Constitution, be deemed harmless, not requiring the

25  automatic reversal of the conviction."  Chapman v. California, 386 U.S. 18, 22 (1967).

26  Such violations are amenable to harmless-error analysis because they may be qualitatively

27  assessed in the context of other evidence presented in order to determine their effect on the

28

trial.  Brecht, 507 U.S. at 629; Fulminante, 499 U.S. at 307; Hardnett, 25 F.3d at 879.

### c.  Denial of Funds

The trial court did not violate Petitioner's constitutional rights when it denied a request for investigative funds, because Petitioner had no right to such funds.

Although a criminal deendant has a constitutional entitlement to a psychiatric expert, see Ake v. Oklahoma, 470 U.S. 68 (1985) the Ninth Circuit has recognized that a criminal defendant has no constitutional entitlement to hire a non-psychiatric expert, see Tiffany v. Legrand, 816 F. App'x 207, 208 (9th Cir. 2020).

Here, Petitioner argues that the trial court should have approved funding for an investigator and DNA testing.  See Pet. at 112, 114.  The record shows that Petitioner did not seek funding for a psychological expert, see Ans., Ex. B at 172:3-10, 365:14-27, 367:13-19, which is what Ake promises.  "Ake . . .  simply cannot be stretched far enough to encompass the right [Petitioner] asserts."  Faulk v. Long, No. 13-cv-5410-EMC-PR, 2015 WL 433578, at *7 (N.D. Cal. Feb. 2, 2015) (explaining that Ake did not entitle the petitioner to investigative funds); accord Harris v. Vasquez, 949 F.2d 1497, 1516 (9th Cir. 1990) (explaining the narrowness of Ake); see also Strickland, 466 U.S. at 681 (no constitutional error where the defense is subject to "[l]imitations of time and money"); Williams v. Calderon, 52 F.3d 1465, 1470 (9th Cir. 1995) (no prejudice where counsel failed to request investigative funds that are made available to capital defendants). Accordingly, this claim fails.

### d.  Alleged Cessation of Investigations

Petitioner's claim that the trial court ordered defense counsel to cease investigations on Petitioner's behalf is belied by the record.  See Supp. Ans. at 34 (explaining there is no support in the record for this claim).

Petitioner first represents that "Art 11 Ex M" supports his argument.  See Pet. at 116.  The Court assumes Petitioner intended to cite Exhibit M to the Petition, which appears at Docket No. 11, but that exhibit is a police incident report and not a statement

1   from the trial court to defense counsel.  See Pet., Ex. M.

2        Petitioner next represents that upon being ordered to cease investigations, defense

3   counsel responded, "Okay, I understand."  Pet. at 116.  The Court scoured the record for

4   this phrase, and concludes that the trial court did not order defense counsel to cease

5   investigations.  Instead, the trial court was ruling on the prosecution's seventh motion in

6   limine.  See Ans., Ex B at 7:6, 9:12.  In that motion, the prosecution sought to prevent the

7   defense counsel from impeaching a witness with unsupported allegations of welfare fraud

8   and other moral turpitude.  See Ans., Ex. C at 359-60.  The trial court reserved ruling on

9   this motion, see Ans., Ex. B at 10:1, but indicated that it was "not inclined to allow

10  impeachment with the conduct until I see what [defense counsel] can come up with."  Id. at

11  11:6-8.  When defense counsel complained that he had not yet been able to obtain police

12  reports, the trial court noted that the tight timeline resulted from Petitioner's demand for a

13  speedy trial.  See id. at 12:5-11.  The trial court did not order defense counsel to cease

14  investigations on Petitioner's behalf, or even rule on the pending motion in limine during

15  that hearing.  See id. at 12:5-14; see also id. at 12:17 (turning to defense counsel's motions

16  without ruling on the prosecution's seventh motion in limine).  Petitioner's creative

17  misquotations notwithstanding, the record does not support a claim that the trial court

18  ordered defense counsel to cease investigations.

19       Third, Petitioner states that the trial court denied late discovery and said that

20  because of Petitioner's demand for a speedy trial and the time constraints resulting from

21  that demand, "we can only do the best we can do."  Pet. at 116.  In the record, this

22  statement did not accompany a denial of discovery.  See Ans., Ex. B at 171:3.  Instead, it

23  accompanies a discussion of a video that was being provided by the prosecution to the

24  defense counsel as soon as it became available.  See id. at 170:19-171:18.  Defense counsel

25  objected that the production of the video was untimely, and the trial court denied the

26  objection because the time constraints were caused by Petitioner's demand for a speedy

27  trial.  See id. at 170:24-171:5.  The trial court thus did not deny discovery; rather, defense

28

United States District Court
Northern District of California

59

1  counsel was given the evening to review the video.  See id. at 171:4-5.

2      There is simply no support for Petitioner's contention that the trial court ordered

3  defense counsel not to investigate.

4              **e.  Alleged Refusal to Hear Motions**

5      The record does not support Petitioner's allegation that the trial court refused to

6  hear Petitioner's motions to dismiss on the basis of a speedy trial violation and to fire

7  counsel under Marsden.  See Pet. at 113.  As to the former, the record reflects that the trial

8  court "read this motion," "f[ou]nd there's no basis for it," and "den[ied] it."  Ans., Ex. B at

9  3:14-15 (going on to encourage Petitioner to work with defense counsel to bring any

10  "appropriate legal arguments).  As to the latter, the record reflects that the trial court

11  conducted a Marsden hearing under seal.  See id. at 275:23.  The record thus shows that

12  the trial court considered Petitioner's motions.

13              **f.  Alleged Reopening of Case**

14      The last claim characterized as structural error in the Petition[14] is that the trial court

15  reopened the case after the jury began deliberating so that the prosecution could introduce

16  new evidence, and refused to allow Petitioner to respond to that evidence.  See Pet. at 116.

17      First, the Court has found no opinions from the United States Supreme Court stating

18  that Petitioner has a constitutional right not to have the criminal trial reopened for new

19  evidence.  Cf. United States v. Bayer, 331 U.S. 532, 538-39 (1947) (no error where trial

20  court refused to reopen after jury deliberations had begun in order to admit new evidence

21  favorable to one defendant, but acknowledging that trial court had the option to reopen, to

22  exclude the evidence, or to declare a mistrial).  The trial court's decision thus could not

23

24  ―――――――――――――――
[14] In the Supplemental Traverse, Petitioner argued for the first time that the trial court was
25  so biased that "there is no way [a]n orange would have been found not guilty."  Supp. Tr.
    at 36, 46.  "A Traverse is not the proper pleading to raise additional grounds for relief,"
26  and so the Court will not consider this improper claim.  Cacoperdo, 37 F.3d at 507.  Even
    if the claim had been properly raised, Petitioner's supposed evidence of bias consists of the
27  alleged structural errors which the Court considered and rejected, supra.  Because
    Petitioner has not introduced any evidence of bias, this claim would fail on the merits even
28  if it had been properly raised.

United States District Court
Northern District of California

1   have been "contrary to, or involved an unreasonable application of, clearly established

2   federal law, as determined by the Supreme Court of the United States." 28 U.S.C.

3   § 2254(d). This alone would justify denying Petitioner's claim.

4           Second, Petitioner again misrepresents the record. Although it is true that the trial

5   court reopened the case after the jury began deliberating, this was so the jury could learn of

6   a "procedural irregularity" in the DNA testing, hear the DNA expert's explanation of the

7   procedural irregularity, and "deliberate with the most accurate evidence possible." See

8   Ans., Ex. B at 499:10, 21-22 (defense counsel, arguing why the trial court should reopen).

9   That is, reopening the case for this new evidence was actually <u>favorable to Petitioner</u>,

10  because it cast doubt on the DNA evidence introduced against him. Where evidence

11  favorable to the defense surfaced after the jury began deliberations, and the trial court

12  refused to reopen to allow the jury to hear that favorable evidence, the Ninth Circuit has

13  held that habeas relief is not warranted. See <u>Quigg v. Crist</u>, 616 F.2d 1107, 1112 (9th Cir.

14  1980) (finding that defendant's new evidence was not significant); <u>Harrison v. Marshall</u>,

15  17 F.3d 394 at *2 (9th Cir. 1994) (unpublished); <u>Castro v. Rubin</u>, 933 F.2d 1013 (9th Cir.

16  1991) (unpublished). The Court has found no binding caselaw where a petitioner

17  complained that the trial court reopened the case to allow new evidence that helped the

18  defense case, much less an opinion holding that such a helpful move by the trial court was

19  erroneous. Here, where the trial court reopened the case so that the jury could hear new

20  evidence helpful to Petitioner, the Court has no difficulty in finding that Petitioner's rights

21  were not violated.

22          In addition, the trial court expressly "allow[ed] argument by both counsel" on the

23  new evidence. <u>Id</u>. at 501:24-25. Defense counsel was able to question the DNA expert

24  about the new evidence of a procedural irregularity. <u>Id</u>. at 507:14-509:21. Petitioner's

25  contention that defense counsel was not permitted to respond to the new evidence is thus

26  false.

27          Based on the foregoing, the state court's rejection of Petitioner's claim of structural

28

United States District Court
Northern District of California

1   error was reasonable and is therefore entitled to AEDPA deference.

2       For the reasons above, Petitioner's claims based on alleged structural error are

3   DENIED.

4       **8.       Claims That Evidence Was Improperly Admitted**

5       Petitioner claims that a 911 call, video, pink slip and note of ownership, and

6   voicemails were all admitted into evidence without foundation, and without a chain of

7   custody having been established.  See Pet. at 74-78.

8       Because these claims were presented for the first time in a state habeas petition in

9   the state high court and were summarily denied, the Court must conduct an independent

10  review of the record to determine whether the state court's decision was an objectively

11  unreasonable application of clearly established federal law.  Plascencia, 467 F.3d at 1198.

12      As an initial matter, to the extent Petitioner claims the trial court's admission of the

13  contested evidence violated state evidentiary law, these claims are not cognizable in the

14  instant proceeding.  See Estelle, 502 U.S. at 67 ( "[A]n inquiry . . . [into the admissibility

15  of evidence pursuant to California law] is no part of a federal court's habeas review of a

16  state conviction.  We have stated many times that federal habeas corpus relief does not lie

17  for errors of state law.") (internal quotation marks and citations omitted); Winzer v. Hall,

18  494 F.3d 1192, 1198 (9th Cir. 2007) ("State court rulings on the admissibility of evidence

19  generally fall outside the scope of federal habeas relief, which is designed only to remedy

20  violations of federal law.").  This Court cannot second-guess the state court's

21  determination under California law that the trial court did not abuse its discretion in

22  admitting the items in question.  See Bradshaw v. Richey, 546 U.S. 74, 76 (2005) (per

23  curiam) ("[A] state court's interpretation of state law, including one announced on direct

24  appeal of the challenged conviction, binds a federal court sitting in habeas corpus.")

25  (citations omitted); Hicks on behalf of Feiock v. Feiock, 485 U.S. 624, 629–30 (1988)

26  ("We are not at liberty to depart from the state appellate court's resolution of these issues

27  of state law.  Although petitioner marshals a number of sources in support of the

28

Order Denying Petition for Writ of Habeas Corpus; Denying COA
P:\PRO-SE\EJD\HC.18\01738Jones_denyHC

United States District Court
Northern District of California

1    contention that the state appellate court misapplied state law on these two points, the

2    California Supreme Court denied review of this case, and we are not free in this situation

3    to overturn the state court's conclusions of state law.") (footnote omitted).

4         A ruling to admit evidence by a state trial court only renders the state proceedings

5    fundamentally unfair when "there are no permissible inferences the jury may draw from

6    the evidence . . . ." Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th Cir. 1991) (emphasis

7    added).  Moreover, even evidence admitted for which there are no permissible inferences

8    must also "be of such a quality as necessarily prevents a fair trial." Id. (quotations

9    omitted); accord Spivey v. Rocha, 194 F.3d 971, 977–78 (9th Cir. 1999) (Rulings on

10   evidentiary matters by a state trial court, even if erroneous, may only be used as a basis for

11   relief under Section 2254 if the ruling "renders the state proceedings so fundamentally

12   unfair as to violate due process.") (citing Hill v. United States, 368 U.S. 424, 428 (1999)).

13         **a.  Video**

14        Petitioner claims that a video taken from a security camera, which depicted

15   Petitioner and "crack head" kidnapping the victim, was improperly admitted.  Petitioner

16   argues that the video was not authenticated, nor was its chain of custody established.  See

17   Pet. at 75-76, 78.  Petitioner does not argue with any particularity that the video was

18   inflammatory, but does imply that the improper admission of all the challenged evidence

19   was prejudicial.  See id.

20        The California court's rejection of Petitioner's claim of improper admission of the

21   video was neither contrary to, nor an objectively unreasonable application of, clearly

22   established federal law.  See 28 U.S.C. § 2254(d).  There are rational inferences that the

23   jury could draw from the video, inferences that are not constitutionally impermissible: for

24   example, the jury could have inferred from the video that the "crack head" was not the

25   person who beat the victim.  Nor was the evidence highly inflammatory under the

26   circumstances of the case, when compared to the testimony of the victim regarding the

27   beatings, the victim's child who witnessed at least some of the beatings, and the officer

28

63

United States District Court
Northern District of California

who saw Petitioner use his daughter as a human shield.  See Jammal, 926 F.2d at 920–21.
The admission of the video did not render the trial fundamentally unfair in violation of due
process.

Moreover, even if there were not permissible inferences to be drawn from the video,
the Court must consider whether the error had a "substantial and injurious effect or
influence in determining the jury's verdict." Brecht, 507 U.S. at 637.  Considering the
strong evidence of Petitioner's guilt discussed above, any error in admitting the video did
not have a "substantial and injurious effect" on the verdict.  See Dillard v. Roe, 244 F.3d
758, 769–70 (9th Cir. 2001), amended on denial of reh'g (May 17, 2001) ("Even if we
assume, without deciding, that the trial court [committed constitutional error], that ruling
could not have had a 'substantial and injurious effect or influence in determining the jury's
verdict.' . . .  There was an abundance of other, uncontradicted evidence that Dillard had
suffered the convictions alleged.") (citations omitted).

Finally, even if there were no permissible inferences to be drawn from the video,
and even if the video was somehow prejudicial, it is not clearly established that the
admission of irrelevant or prejudicial evidence justifies the issuance of the writ.  See
Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009).  Accordingly, Petitioner is not
entitled to federal habeas relief on his claim that the video was improperly admitted.

Based on the foregoing, the state court's rejection of Petitioner's claim was
reasonable and is therefore entitled to AEDPA deference.  Accordingly, this claim is
DENIED.

### b.  911 call

Petitioner claims that a recording and transcript of a 911 call placed by the victim,
in which the victim stated that Petitioner had kidnapped her and requested police and
emergency medical assistance,[15] was improperly admitted.  See Dkt. No. 33-5 at 5-

---

[15] Petitioner did not raise a Confrontation Clause claim.  Even if he had, such a claim
would fail.  Not only is there a well-established exception to the general bar against
testimonial hearsay for statements made requesting assistance in an ongoing emergency,

64

United States District Court
Northern District of California

1   (transcript of the 911 call).  Petitioner argues that the recording and transcript of the call

2   were not properly authenticated because only the victim testified as to their authenticity.

3   See Pet. at 77, 78.  Petitioner recites that the recording of the call was prejudicial, but does

4   not argue with any particularity as to why.  See id.

5          The California court's rejection of Petitioner's claim of improper admission of the

6   911 recording and transcript was neither contrary to, nor an objectively unreasonable

7   application of, clearly established federal law.  See 28 U.S.C. § 2254(d).  There are

8   rational inferences that the jury could draw from the 911 recording and transcript,

9   inferences that are not constitutionally impermissible: for example, the jury could have

10  drawn inferences regarding the victim's identification of Petitioner as her assailant.  See

11  Avila v. Ducart, No. 08-cv-2882-SBA-PR,  2014 WL 5035416, at *10 (N.D. Cal. Sept. 30,

12  2014) (911 tape did not violate due process because the jury could draw inferences as to

13  what transpired, identification of the assailants, and motive).  Nor was the evidence highly

14  inflammatory under the circumstances of the case, when compared to the testimony of the

15  victim regarding the beatings, the victim's child who witnessed at least some of the

16  beatings, and the officer who saw Petitioner use his daughter as a human shield.  See

17  Jammal, 926 F.2d at 920–21.  The admission of the 911 recording and transcript did not

18  render the trial fundamentally unfair in violation of due process.

19         Moreover, even if there were not permissible inferences to be drawn from the 911

20  recording and transcript, the Court must consider whether the error had a "substantial and

21  injurious effect or influence in determining the jury's verdict."  Brecht, 507 U.S. at 637.

22  Considering the strong evidence of Petitioner's guilt discussed above, any error in

23  admitting the 911 recording and transcript did not have a "substantial and injurious effect"

24  on the verdict.  See Dillard, 244 F.3d at 769–70 ("Even if we assume, without deciding,

25  that the trial court [committed constitutional error], that ruling could not have had a

26

27  _____

28  see Davis v. Washington, 547 U.S. 813, 817 (2006), the victim was available for cross-
    examination, and was cross-examined by defense counsel, in this case.

65

1    'substantial and injurious effect or influence in determining the jury's verdict.' . . .  There

2    was an abundance of other, uncontradicted evidence that Dillard had suffered the

3    convictions alleged.") (citations omitted).

4          Finally, even if there were no permissible inferences to be drawn from the 911

5    recording and transcript, and even if recording and transcript were somehow more

6    prejudicial than the overwhelming evidence introduced against Petitioner, it is not clearly

7    established that the admission of irrelevant or prejudicial evidence justifies the issuance of

8    the writ.  See Holley, 568 F.3d at 1101.  Accordingly, Petitioner is not entitled to federal

9    habeas relief on his claim that the 911 recording and transcript were improperly admitted.

10         Based on the foregoing, the state court's rejection of Petitioner's claim was

11   reasonable and is therefore entitled to AEDPA deference.

12                    **c.   Pink slip and note of ownership**

13         Petitioner claims that a pink slip to and note of ownership for the victim's car were

14   improperly admitted.  See Dkt. No. 33-5 at 5- (transcript of the 911 call).  Petitioner argues

15   that the pink slip and note of ownership lacked foundation, and the chain of custody was

16   not established.  See Pet. at 78.  Petitioner does not argue with any particularity that the

17   admission of the pink slip and note of ownership was inflammatory, but does imply that

18   the improper admission of all the challenged evidence was prejudicial.  See id.

19         The California court's rejection of Petitioner's claim of improper admission of the

20   pink slip and note of ownership was not contrary to, or an objectively unreasonable

21   application of, clearly established federal law.  See 28 U.S.C. § 2254(d).  There are

22   rational inferences that the jury could draw from the pink slip and note of ownership,

23   inferences that are not constitutionally impermissible: for example, the jury could have

24   inferred from these items that the victim actually possessed the car which she claimed the

25   Petitioner was attempting to extort from her.  Nor was the evidence highly inflammatory

26   under the circumstances of the case, when compared to the testimony of the victim

27   regarding the beatings, the victim's child who witnessed at least some of the beatings, and

28

Order Denying Petition for Writ of Habeas Corpus; Denying COA
P:\PRO-SE\EJD\HC.18\01738Jones_denyHC

United States District Court
Northern District of California

the officer who saw Petitioner use his daughter as a human shield.  See Jammal, 926 F.2d at 920–21.  The admission of the pink slip and note of ownership did not render the trial fundamentally unfair in violation of due process.

Moreover, even if there were not permissible inferences to be drawn from the pink slip and note of ownership, the Court must consider whether the error had a "substantial and injurious effect or influence in determining the jury's verdict."  Brecht, 507 U.S. at 637.  Considering the strong evidence of Petitioner's guilt discussed above, any error in admitting the pink slip and note of ownership did not have a "substantial and injurious effect" on the verdict.  See Dillard, 244 F.3d at 769–70 ("Even if we assume, without deciding, that the trial court [committed constitutional error], that ruling could not have had a 'substantial and injurious effect or influence in determining the jury's verdict.' . . . There was an abundance of other, uncontradicted evidence that Dillard had suffered the convictions alleged.") (citations omitted).

Finally, even if there were no permissible inferences to be drawn from the pink slip and note of ownership, and even if these items were somehow prejudicial, it is not clearly established that the admission of irrelevant or prejudicial evidence justifies the issuance of the writ.  See Holley, 568 F.3d at 1101.  Accordingly, Petitioner is not entitled to federal habeas relief on his claim that the pink slip and note of ownership were improperly admitted.

Based on the foregoing, the state court's rejection of Petitioner's claim was reasonable and is therefore entitled to AEDPA deference.

### d.  Voicemails

Petitioner claims that voicemails, in which Petitioner asked one of his children for help and reminded the child that "[y]ou know what to do," and said that he "just love[s] wrong," were improperly admitted.  See Dkt. No. 33-5 at 8, 10 (transcripts of the voicemails).  Petitioner argues that the voicemails were not authenticated, nor was their chain of custody established.  See Pet. at 78.  Petitioner does not argue with any

United States District Court
Northern District of California

1    particularity that the voicemails were inflammatory, but does imply that the improper

2    admission of all the challenged evidence was prejudicial.  See id.

3          The California court's rejection of Petitioner's claim of improper admission of the

4    voicemails was not contrary to, or an objectively unreasonable application of, clearly

5    established federal law.  See 28 U.S.C. § 2254(d).  There are rational inferences that the

6    jury could draw from the voicemails, inferences that are not constitutionally

7    impermissible: for example, the jury could have inferred from these items that the

8    Petitioner's attack on the victim was an act of domestic violence, as necessary to support

9    one of the enhancements with which Petitioner was charged.  See Ans., Ex. A at 496-98,

10   500-12.  Nor was the evidence highly inflammatory under the circumstances of the case,

11   when compared to the testimony of the victim regarding the beatings, the victim's child

12   who witnessed at least some of the beatings, and the officer who saw Petitioner use his

13   daughter as a human shield.  See Jammal, 926 F.2d at 920–21.  The admission of the

14   voicemails did not render the trial fundamentally unfair in violation of due process.

15         Moreover, even if there were not permissible inferences to be drawn from the

16   voicemails, the Court must consider whether the error had a "substantial and injurious

17   effect or influence in determining the jury's verdict."  Brecht, 507 U.S. at 637.

18   Considering the strong evidence of Petitioner's guilt discussed above, any error in

19   admitting the voicemails did not have a "substantial and injurious effect" on the verdict.

20   See Dillard, 244 F.3d at 769–70 ("Even if we assume, without deciding, that the trial court

21   [committed constitutional error], that ruling could not have had a 'substantial and injurious

22   effect or influence in determining the jury's verdict.' . . .  There was an abundance of

23   other, uncontradicted evidence that Dillard had suffered the convictions alleged.")

24   (citations omitted).

25         Finally, even if there were no permissible inferences to be drawn from the

26   voicemails, and even if the voicemails were somehow prejudicial, it is not clearly

27   established that the admission of irrelevant or prejudicial evidence justifies the issuance of

28

United States District Court
Northern District of California

68

1   the writ.  See Holley, 568 F.3d at 1101.  Accordingly, Petitioner is not entitled to federal

2   habeas relief on his claim that the voicemails were improperly admitted.

3          Based on the foregoing, the state court's rejection of Petitioner's claim was

4   reasonable and is therefore entitled to AEDPA deference.

5          For the reasons above, Petitioner's claims based on allegedly inadmissible evidence

6   are DENIED.

7              **9.     Claim That Jury Instructions Were Improper**

8          Petitioner claims that the trial court improperly instructed the jury regarding the

9   jurors' notes on the case.  Specifically, Petitioner argues that the trial court "instructed

10  jurors to take notes at home based on their memories," but "did not give jurors instructions

11  on where to take notes at home, where to store the notes[,] or when and how to destroy [the

12  notes."  Pet. at 6.

13         Because this claim was presented for the first time in a state habeas petition in the

14  state high court and was summarily denied, the Court must conduct an independent review

15  of the record to determine whether the state court's decision was an objectively

16  unreasonable application of clearly established federal law.  Plascencia, 467 F.3d at 1198.

17         An allegedly erroneous jury instruction may not be judged in artificial isolation but

18  must be considered in the context of the instructions as a whole and the trial record.  See

19  Estelle, 502 U.S. at 72.  A habeas petitioner is not entitled to relief unless the instructional

20  error "'had a substantial and injurious effect or influence in determining the jury's

21  verdict.'"  Brecht, 507 U.S. at 637 (quoting Kotteakos, 328 U.S. at 776).  In other words,

22  state prisoners seeking federal habeas relief may obtain plenary review of constitutional

23  claims of trial error but are not entitled to habeas relief unless the error resulted in "actual

24  prejudice."  Id. (citation omitted).

25         Petitioner has misrepresented the record; the challenged statement does not appear

26  in a jury instruction.  The only affirmative instruction the trial court gave the jury

27  regarding notetaking was that the jury is permitted to take notes, which was accompanied

28

United States District Court
Northern District of California

with a caution about reliance on those notes:

> You have been given notebooks and may take notes during the trial.  Do not remove them from the courtroom.  You may take your notes into the jury room during deliberations.  I do not mean to discourage you from taking notes but here are some points to consider if you take notes:

> One, note taking may tend to distract you.  It may affect your ability to listen carefully to all the testimony and to watch the witnesses as they testify.

> And two, the notes are for your own individual use to help you remember what happened during the trial.

> Please keep in mind that your notes may be inaccurate or incomplete.  At the end of the trial, your notes will be collected and destroyed.

Ans., Ex. B at 21:21-22:6; see also 470:27-471:11 (same, with the additional admonishment that the court reporter's record, rather than a juror's notes, are accurate).

Respondent explains that under California Rule of Court 2.1031,[16] the trial court was required to give such an instruction.  See Ans. at 12-13.  Moreover, the Ninth Circuit has previously held that "it is within the sound discretion of the trial judge and does not constitute error" to allow jurors to take notes.  Harris v. United States, 261 F.2d 792, 796 (9th Cir. 1958).

Rather than challenging a jury instruction, Petitioner challenges the trial court's response to a jury question.  The juror asked if, so long as notes taken in court were left in the courthouse, the juror was allowed to "ma[k]e a note" at "home from memory" regarding the case.  Ans., Ex. B at 27:3-5.  The trial court answered that this was not forbidden, "as long as it won't prejudice the case."  Id. at 27:7.  The trial court admonished the juror that, if the juror elected to make a note at home from memory, the juror should not share that note or "go on the Internet or anything else."  Id. at 27:10-11.

Petitioner's claim does not merit federal habeas relief for three reasons.  First, as

---

[16] "Jurors must be permitted to take written notes in all civil and criminal trials.  At the beginning of a trial, a trial judge must inform jurors that they may take written notes during the trial.  The court must provide materials suitable for this purpose."  Cal. Ct. R. 2.1031.

70

Respondent argues, this is not a cognizable claim in a federal habeas petition.  <u>See</u> Ans. at

11; <u>see also supra</u>, B.2 (explaining what is and is not cognizable).  As such, to the extent

Petitioner's claim is based solely on the trial court's alleged misapplication of California

law regarding jurors' notetaking, such a claim is not cognizable on federal habeas review.

Second, the Court has not found any United States Supreme Court precedent, nor do

the parties cite any, that squarely addresses whether a criminal defendant has a

constitutional right to prevent a juror making a note at home from memory.  In the absence

of such precedent, the Court cannot conclude that the state court's decision was contrary

to, or involved an unreasonable application of, clearly established Federal law.  28 U.S.C.

§ 2254(d)(1); <u>Wright v. Van Patten</u>, 552 U.S. 120, 126 (2008) (per curiam) (where no

decision of the Supreme Court squarely addresses an issue, it cannot be said that the state

courts unreasonably applied clearly established federal law for purposes of 28 U.S.C.

§ 2254(d)); <u>Moses v. Payne</u>, 555 F.3d 742, 754 (9th Cir. 2009).

Third, even assuming that there had been a constitutional violation, any error was

harmless.  <u>See Brecht</u>, 507 U.S. at 637–38 (habeas relief not warranted unless the error had

a "substantial and injurious effect or influence in determining the jury's verdict.").

Petitioner has failed to articulate any reason allowing a juror to transcribe on paper what is

already in that juror's head would have an "injurious effect" on the juror's verdict.  Indeed,

as the California Supreme Court has noted, "it would be entirely unrealistic to expect

jurors not to think about the case during the trial and when at home."  <u>People v. Collins</u>, 49

Cal. 4th 175, 253 (2010) (no misconduct where juror used computer program at home to

create diagram of shooting, where information on which the juror based the diagram came

entirely from trial); <u>Fowler v. Lewis</u>, No. 02-cv-3834-RMW, 2010 WL 1037976, at *11

(N.D. Cal. Mar. 19, 2010) (where jury foreman made chart outside jury room and

presented that chart to other jurors, no misconduct because chart was based on information

from trial and dictionary, and jurors may contemplate evidence separate and record ideas

they wish to share in deliberations) (citing <u>Bormann v. Chevron USA, Inc.</u>, 56 Cal. App.

71

4th 260, 265 (1997) ("the permissibility of jurors' recording ideas that they wish to share in deliberations is consistent with the requirement and promise that all jurors actively and fully participate in those deliberations")).  Moreover, even if at-home notes were impermissible, Petitioner cites no evidence that the juror in question <u>actually</u> made notes at home, only that the juror asked whether such an action might be <u>allowed</u>.  <u>See generally</u>, Pet.

Finally, as noted several times above, the evidence against Petitioner was overwhelming.  <u>See supra</u>, B.1.  In light of this ample evidence, there is no reasonable possibility that a note jotted down by one juror at home, based solely on information presented at trial and not shared with anyone else, would have affected the jury's verdict.

Petitioner fails to demonstrate that the state court rejection of his claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d).

For these reasons, Petitioner's claim regarding an allegedly defective jury instruction is DENIED.

### 10.   Claim Regarding New Evidence[17]

Petitioner claims to have discovered new evidence in the victim's medical file, which he contends entitles him to a new trial.  <u>See</u> Pet. at 80-89 (citing Pet., Ex. D).  Specifically, Petitioner contends that the victim's medical file demonstrates she did not suffer any great bodily injury, thus supporting his argument that the torture charge was invalid, <u>see id</u>. at 83, 86-88; that the victim bore tell-tale signs of self-inflicted wounds, which could have been used to impeach her testimony, <u>see id</u>. at 83-84; that the victim had methamphetamines and opioids in her system, <u>see id</u>. at 84-85, which could have been used to impeach her testimony that she slept during much of her captivity, <u>see id</u>. at 86; that the victim was well-nourished, which is inconsistent with her testimony that she did

---

[17] Petitioner's motions for the admission of new evidence have been addressed, <u>supra</u>.

United States District Court
Northern District of California

1  not eat during her captivity, see id. at 88; and that the victim has made inconsistent

2  statements regarding her housing situation, which defense counsel could have used to

3  impeach her testimony, id. at 89.

4          Because this claim was presented for the first time in a state habeas petition in the

5  state high court and was summarily denied, the Court must conduct an independent review

6  of the record to determine whether the state court's decision was an objectively

7  unreasonable application of clearly established federal law.  Plascencia, 467 F.3d at 1198.

8          First, Petitioner's new-evidence claim is not cognizable in a federal habeas petition.

9  "Claims of actual innocence based on newly discovered evidence have never been held to

10  state a ground for federal habeas relief absent an independent constitutional violation

11  occurring in the underlying state criminal proceeding."  Herrera v. Collins, 506 U.S. 390,

12  400 (1993).  "This rule is grounded in the principle that federal habeas courts sit to ensure

13  that individuals are not imprisoned in violation of the Constitution—not to correct errors of

14  fact."  Id.  Evidence of actual innocence instead can only serve as "a gateway through

15  which a habeas petitioner must pass to have his otherwise barred constitutional claim

16  considered on the merits." Id. 506 U.S. at 404.  See also Schlup v. Delo, 513 U.S. 298,

17  327–328 (1995) (establishing appropriate use of evidence of actual innocence in a federal

18  habeas proceeding).  Thus, a petitioner relying on evidence of actual innocence must

19  establish that there was constitutional error in his trial which "has probably resulted in the

20  conviction of one who is actually innocent,"[18] and that, "in light of the new evidence, it is

21  more likely than not that no reasonable juror would have convicted him." Bousley v.

22  United States, 523 U.S. 614, 623 (1998) (citations omitted).  Here, as discussed above,

23  Petitioner has not established that any constitutional error occurred during his trial.  See

24  supra, B.1-9.  His assertion that he has newly discovered evidence is therefore unavailing.

25

26  _____

27  [18] Here, Petitioner does not "make[] a freestanding claim . . . that he is entitled to relief despite a constitutionally valid conviction."  Carriger v. Stewart, 132 F.3d 463, 476 (9th Cir. 1997).  Rather, Petitioner contends that new evidence shows his conviction was constitutionally invalid.

28

United States District Court
Northern District of California

1

2

3

4

5

Second, as with Petitioner's previous claim, he cites only California law in support of his claim.  See, e.g., Pet. at 80-82 (arguing he should be granted a new trial based on a California Supreme Court case and provisions of the California Penal Code).  As explained, supra B.2-3, a claim that rests solely on state law is not cognizable in a federal habeas petition.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

Third, even if this claim were cognizable in a federal habeas petition, as Respondent notes, Petitioner does not explain how the medical file is "new."  In the Petition, he argues that "no foundation was laid for the admittance of the medical file." Pet. at 80.  He also stated that he "procured this new evidence on" January 22, 2018. Id. at 81.  But these statements do not mean that the file was not in counsel's possession during the trial, nor do they mean that the medical file is "evidence which could not reasonably have been presented to the state trier of facts."  Townsend v. Sain, 372 U.S. 293, 317 (1963) (describing "newly discovered" evidence), overruled on other grounds by Keeney v. Tamayo-Reyes, 504 U.S. 1 (1992).  Indeed, a medical report was entered into evidence during trial, see Ans., Ex. A at 400; that report catalogued the victim's injuries upon her admission to the hospital immediately after she escaped from Petitioner, see Ans., Ex. B at 153:10-11; the nurse who generated the medical report was called as a witness, defense counsel cross-examined her about the details of her treatment of the victim, and the nurse referred to the medical report during that cross-examination,  see Ans., Ex. B at 152:11-156:14.  Defense counsel was thus at least on notice about the existence of the medical file, and the trial transcript suggests that defense counsel had access to that file.

22

23

24

25

26

27

Fourth, even if Petitioner were able to state a cognizable claim, and even if this evidence were new, the Court has already rejected the arguments Petitioner would base on this new evidence.  The Court has already explained that a victim need not have broken bones for the assailant to be found to have inflicted great bodily injury, see supra, B.6.a; that the mere location of wounds is insufficient to demonstrate that those wounds were self-inflicted, see supra B.5.b; that the victim had wounds which, even crediting

28

Order Denying Petition for Writ of Habeas Corpus; Denying COA
P:\PRO-SE\EJD\HC.18\01738Jones_denyHC

United States District Court
Northern District of California

Petitioner's argument, could not have been self-inflicted, see id.; and that the victim never testified she had not eaten during her captivity, see supra B.4.a.i.  As to Petitioner's argument that the victim made inconsistent statements regarding her housing situation, counsel was aware of this in preliminary hearings, and attempted to impeach the victim on this basis.  See Ans, Ex. A at 226:2-228:25.  As to Petitioner's argument that the victim's blood tested positive for methamphetamines and defense counsel could have used this test to impeach her testimony, as Respondent notes the fact that the victim's blood tested positive for drugs bolsters the victim's testimony that Petitioner forced her to take drugs.  See Ans. at 20.  Moreover, as the Court explained above, defense counsel was able to impeach the victim during her testimony.  See supra, B.5.c.

Finally, Petitioner has not shown that the outcome of the trial would likely have been different had he had possession of the medical file.  As the Court has noted above, the evidence against Petitioner was overwhelming.  The medical report does not contradict that evidence; indeed, the report's references to the victim's injuries and the drugs in her system actually bolster her testimony.  Accordingly, the Court cannot find that the state court was unreasonable in rejecting this claim.

For these reasons, Petitioner's claim based on allegedly new evidence is DENIED.

## IV.  CONCLUSION

After a careful review of the record and pertinent law, the Court concludes that the Petition for a Writ of Habeas Corpus must be **DENIED**.

Further, a Certificate of Appealability is **DENIED**.  See Rule 11(a) of the Rules Governing Section 2254 Cases.  Petitioner has not made "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  Nor has Petitioner demonstrated that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  Slack v. McDaniel, 529 U.S. 473, 484 (2000).  Petitioner may not appeal the denial of a Certificate of Appealability in this Court but may seek a

United States District Court
Northern District of California

certificate from the Court of Appeals under Rule 22 of the Federal Rules of Appellate Procedure.  <u>See</u> Rule 11(a) of the Rules Governing Section 2254 Cases.

The Clerk shall terminate any pending motions, enter judgment in favor of Respondent, and close the file.

**IT IS SO ORDERED**.

Dated:   3/18/2021

EDWARD J. DAVILA
United States District Judge

Order Denying Petition for Writ of Habeas Corpus; Denying COA
P:\PRO-SE\EJD\HC.18\01738Jones_denyHC